JOHNSON & WEAVER, LLP
Frank J. Johnson *(to be admitted pro hac vice)*
frankj@johnsonandweaver.com
Nathan R. Hamler *(to be admitted pro hac vice)*
nathanr@johnsonandweaver.com
110 West "A" Street, Suite 750
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856

*Attorneys for Plaintiff*
*David L. Hasbrouck*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

DAVID L. HASBROUCK, derivatively on behalf of GALECTIN THERAPEUTICS, INC.,

Plaintiff,

v.

PETER G. TRABER; JAMES C. CZIRR; JACK W. CALLICUTT; GILBERT F. AMELIO; KEVIN D. FREEMAN; ARTHUR R. GREENBERG; ROD D. MARTIN; JOHN F. MAULDIN; STEVEN PRELACK; HERMAN PAUL PRESSLER, III; and DR. MARC RUBIN,

Defendants,

-and-

GALECTIN THERAPEUTICS, INC., a Nevada corporation,

Nominal Defendant.

Case No.:

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

DEMAND FOR JURY TRIAL

By and through his undersigned counsel, Plaintiff David L. Hasbrouck ("Plaintiff") brings this shareholder derivative action on behalf of Nominal Defendant Galectin Therapeutics, Inc. ("Galectin" or the "Company") and against certain current officers and directors of the Company for breaches of fiduciary duties, unjust enrichment, corporate waste, and aiding and abetting thereof. Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which includes, without limitation: a) review and analysis of public filings made by Galectin and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; c) review of news articles, shareholder communications, and postings on Galectin's website concerning the Company's public statements; d) pleadings, papers, and any documents filed with and publicly available from the related pending securities fraud class action, *Ballesteros v. Galectin Therapeutics, Inc.*, Case No. 3:14-cv-00399-RCJ-WGC (the "Securities Class Action"); and e) review of other publicly available information concerning Galectin and the Individual Defendants (defined below).

## NATURE AND SUMMARY OF THE ACTION

1. Galectin is a development stage company engaged in the research and development of therapies for fibrotic disease and cancer.

2. Among the Company's lead product candidates is GR-MD-02, a complex polysaccharide polymer which is being tested for the treatment of liver fibrosis and fatty liver disease ("NASH").

3. Since at least January 6, 2014 through the present (the "Relevant Period"), the Individual Defendants caused the Company to issue false and misleading statements concerning the Company's financial and business prospects and its lead product candidate, GR-MD-02.

4. On July 28, 2014, Bleecker Street Research published an article on *SeekingAlpha.com* claiming Galectin "has strong ties to stock promoters," engaging in a misleading brand awareness campaign aimed at boosting its stock price.

5. On July 28, 2014, Adam Feuerstein ("Feuerstein") published an article on *TheStreet.com* denoting Emerging Growth Corp. ("Emerging Growth"), through its parent company TDM Financial ("TDM"), a penny-stock promotions firm, was the investor relations and marketing company Galectin was paying for misleading promotional campaigns to entice investors to buy its stock.

6. On this news, investors fled from Galectin's stock, causing the Company's stock price to collapse $8.84 per share to close at $5.70 per share on July 29, 2014 – a drop of more than 60% - and shrinking Galectin's market cap by more than $190 million in a single day.

7. In fact, the Individual Defendants knew, but concealed from the investing public, that the Company was utilizing the services of paid stock promoters to disseminate positive (albeit, misleading) reports about Galectin's prospects and that GR-MD-02 did not provide the benefits suggested by the Individual Defendants when discussing the patent the Company was awarded or the Phase 1 clinical trial it was conducting.

8. As a result of the Individual Defendants' conduct, Galectin's common stock traded at artificially inflated levels during the Relevant Period. When the truth regarding the Company's use of a stock promoter coupled with the "poor" performance of GR-MD-02 were announced, the Company's share price plunged, erasing tens of millions of dollars in market capitalization.

9. Galectin's Board of Directors (the "Board") has not, and will not commence litigation against the Individual Defendants named in this complaint, let alone vigorously prosecute such claims, because they face a substantial likelihood of liability to Galectin for

authorizing or failing to correct the false and misleading statements alleged herein and for failing to correct and/or implement the necessary internal controls to prevent the harm to the Company that has occurred. Accordingly, a pre-suit demand upon Galectin's Board is a useless and futile act. Thus, Plaintiff rightfully brings this action to vindicate Galectin's rights against its wayward fiduciaries and hold them responsible for the damages they have caused to Galectin.

## JURISDICTION AND VENUE

14. The Court has jurisdiction over all claims under 28 U.S.C. §1332 because there is complete diversity among the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

15. The Court has jurisdiction over each defendant because each defendant is either a corporation that does sufficient business in Nevada, or is an individual who has sufficient minimum contacts with Nevada so as to render the exercise of jurisdiction by the Nevada courts permissible under traditional notions of fair play and substantial justice.

16. Venue is proper in this District pursuant to 28 U.S.C. §1391 because many of the acts and practices complained of herein occurred in this District and Galectin is incorporated in Nevada.

17. In connection with the acts and conduct alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## THE PARTIES

18. Plaintiff is, and at all relevant times has been, a holder of Galectin common stock. Plaintiff is a citizen of Ohio.

19. Nominal Defendant Galectin is incorporated in Nevada with its principal place of business located at 4960 Peachtree Industrial Boulevard, Suite 240, Norcross, Georgia 30071. Galectin is a development stage company engaged in the research and development of therapies for fibrotic disease and cancer. The Company's common stock is traded on the NASDAQ Capital Markets under the ticker symbol "GALT." The Company has more than 21 million shares outstanding.

20. Defendant Peter G. Traber ("Traber") has been Galectin's President and Chief Executive Officer ("CEO") since March 2011 and a director of the Company since February 2009. Traber is also the Company's Chief Medical Officer. Traber is a defendant in the Securities Class Action. Traber received $612,690 in total compensation from Galectin in 2013 and $1,089,299 in total compensation from Galectin in 2012. Traber is a citizen of Georgia.

21. Defendant James C. Czirr ("Czirr") has served as Chairman of the Board since February 2009 and as Executive Chairman since February 2010. Czirr co-founded Galectin in July 2000 and in 2009 he, along with Defendant Rod D. Martin ("Martin"), led the takeover of Galectin. Czirr, along with Martin, is also the co-founder of 10X Fund, L.P. and is a managing member of 10X Capital Management, LLC, the general partner of 10X Fund, L.P. As of March 19, 2014, 10X Fund L.P. is the owner of all of the issued and outstanding shares of Galectin Series B preferred stock. As holders of Galectin Series B preferred stock, 10X Fund L.P. has the right to, among other things, vote as a separate class to nominate and elect two directors, referred to as the Series B directors, and to nominate three directors, referred to as the Series B nominees, who must be recommended for election by holders of all of Galectin's securities entitled to vote on election of directors. Czirr is the Series B director. Czirr is a defendant in the Securities Class Action. Czirr received $437,214 in total compensation from

Galectin in 2013 and $292,192 in total compensation from Galectin in 2012. Czirr is a citizen of Idaho.

22. Defendant Jack W. Callicutt ("Callicutt") has served as the Chief Financial Officer ("CFO") of the Company since July 2013. Callicutt is a defendant in the Securities Class Action. Callicutt received $853,919 in total compensation from Galectin in 2013. Callicutt is a citizen of Georgia.

23. Defendant Gilbert F. Amelio ("Amelio") has served as a director of the Company since February 2009. During the Relevant Period, Amelio was a member of the Nominating and Corporate Governance Committee and the Compensation Committee. Amelio is a citizen of California.

24. Defendant Kevin D. Freeman ("Freeman") has served as a director of the Company since May 2011. During the Relevant Period, Freeman was a member of the Audit Committee. Freeman is a citizen of Texas.

25. Defendant Arthur R. Greenberg ("Greenberg") has served as a director of the Company since August 2009. During the Relevant Period, Greenberg was a member of the Audit and Compensation Committees. Greenberg is a citizen of California.

26. Defendant Martin has served as Vice Chairman of the Board since February 2010 and as a director of the Company since February 2009 since he, along with Czirr, led a takeover of the Company. Martin, along with Czirr, is the co-founder of 10X Fund, L.P. and is a managing member of 10X Capital Management, LLC, the general partner of 10X Fund, L.P. As of March 19, 2014, 10X Fund L.P. is the owner of all of the issued and outstanding shares of Galectin Series B preferred stock. During the Relevant Period, Martin was the chairperson of the Compensation and the Nominating and Corporate Governance Committees. Martin is a citizen of Florida.

27. Defendant John F. Mauldin ("Mauldin") has served as a director of the Company since May 2011. Mauldin is a citizen of Texas.

28. Defendant Steven Prelack ("Prelack") has served as a director of the Company since April 2003. During the Relevant Period, Prelack was chairperson of the Audit Committee. Prelack is a citizen of Massachusetts.

29. Defendant Herman Paul Pressler, III ("Pressler") has served as a director of the Company since May 2011. During the Relevant Period, Pressler was a member of the Nominating and Corporate Governance Committee. Pressler is a citizen of Texas.

30. Defendant Dr. Marc Rubin ("Rubin") has served as a director of the Company since October 2011. Rubin is a citizen of New Jersey.

31. Defendants identified in ¶¶ 20-30 are sometimes referred to herein as the "Individual Defendants."

32. Defendants identified in ¶¶ 20-21, 23-30 are sometimes referred to herein as the "Director Defendants."

33. Defendants identified in ¶¶ 24, 25, and 28 are sometimes referred to herein as the "Audit Committee Defendants."

## FACTUAL ALLEGATIONS

34. Galectin is a development stage company engaged in the research and development of therapies for fibrotic disease and cancer.

35. The Company's lead product candidates include GR-MD-02 to treat NASH, a disease that leads to fatty buildup in the liver and can potentially lead to cirrhosis and/or liver cancer.

36. The Company is in Phase 1 clinical trials for GR-MD-02 to assess the drug's safety and efficacy in treating patients with NASH.

37. On January 6, 2014, the Individual Defendants caused Galectin to issue a press release entitled "Galectin Therapeutics Receives US Patent for Combination Treatment for Liver Fibrosis." The release stated in part:

> Galectin Therapeutics, the leading developer of therapeutics that target galectin proteins to treat fibrosis and cancer, today announced that it has received a notice of allowance from the U.S. Patent and Trademark Office for patent application number 13/550,962 titled "Galactose-Pronged Polysaccharides in a Formulation for Antifibrotic Therapies." The patent covers both composition claim for and uses of the Company's carbohydrate-based galectin inhibitor compound GR-MD-02 for use in patients with liver fibrosis in combination with other potential therapeutic agents. The patent covers use of GR-MD-02 with agents directed at multiple targets, some of which are currently in clinical development for fibrotic disorders including monoclonal antibodies to connective tissue growth factor, integrins, and TGF-β1.
>
> "This patent provides additional coverage in the U.S. for the use of GR-MD-02 in combination with other potential anti-fibrotic agents in the treatment of liver fibrosis," said Peter G. Traber, MD, President, CEO and CMO of Galectin Therapeutics. "In the future, liver fibrosis could be treated with a combination of agents, and this patent provides important intellectual property for this possibility. We are hopeful that our development program for GR-MD-02 will lead to the first therapy for the large unmet medical need of liver fibrosis."
>
> Galectin Therapeutics is currently conducting a Phase 1 clinical trial to evaluate the safety, tolerability and exploratory biomarkers for efficacy for single and multiple doses of GR-MD-02 over four weekly doses of GR-MD-02 treatment in patients with fatty liver disease with advanced fibrosis. In March 2013, the U.S. Food and Drug Administration (FDA) granted GR-MD-02 Fast Track designation for nonalcoholic steatohepatitis (NASH) with hepatic fibrosis, commonly known as fatty liver disease with advanced fibrosis.

38. In the three days following this release, Galectin's stock skyrocketed from $8.47 per share to $15.10 per share on heavy volume. The stock continued its upward trend culminating in a Relevant Period high of $18.30 per share on February 27, 2014.

39. On March 25, 2014, the Individual Defendants caused Galectin to issue a press release entitled "Galectin Therapeutics to Announce Results From First Cohort of Phase 1 Clinical Trial in Fatty Liver Disease," announcing that the Company "will report results from the

first cohort of its Phase 1 clinical trial examining GR-MD-02 in fatty liver disease (NASH) with advanced fibrosis" on March 31, 2014.

40. On March 31, 2014, the Individual Defendants caused Galectin to issue a press release entitled "First Cohort Results in Galectin Therapeutics' Phase 1 Trial Reveal Biomarker Evidence of Therapeutic Effect on Fibrosis and Inflammation in NASH With Advanced Fibrosis," which stated in part:

> "We are extremely pleased with the positive results of the first cohort of our Phase 1 trial, which suggest a role for GR-MD-02 in the treatment of patients with fatty liver disease with advanced fibrosis," said Peter G. Traber, M.D., Chief Executive Officer, President and Chief Medical Officer of Galectin Therapeutics. "Fatty liver disease, characterized by the presence of fat in the liver along with inflammation, over time can develop into fibrosis, or scarring of the liver, which is estimated to affect millions of Americans. Intervention with the intent of reversing the fibrosis is a potentially important therapeutic approach in fatty liver disease, a condition with significant unmet medical need."

41. On April 23, 2014, the Individual Defendants caused Galectin to issue a press release entitled "Galectin Therapeutics Completes Enrollment of Second Cohort of Phase 1 Trial of GR-MD-02 for NASH (Fatty Liver Disease) With Advanced Fibrosis," which stated in part:

> "We are pleased that enrollment of the second cohort was completed very rapidly, which speaks to the urgent need to identify an effective treatment for fatty liver disease with advanced fibrosis," said Dr. Peter G. Traber, President, Chief Executive Officer, and Chief Medical Officer of Galectin Therapeutics Inc. "The goal of therapy with GR-MD-02 in NASH patients with advanced fibrosis is the reversal of fibrosis and prevention of complications of cirrhosis and liver transplantation."

42. On May 13, 2014, the Individual Defendants caused Galectin to issue a press release announcing it first quarter 2014 financial results. The Company reported a net loss of $5.4 million, or ($0.27) diluted earnings per share ("EPS) for the first quarter of 2014. The release stated in part:

> "We continued to make significant progress in our liver fibrosis development program through the first quarter of 2014. We announced the successful results of the first cohort of patients in our Phase 1 clinical trial for patients with NASH with advanced fibrosis, which demonstrated that GR-MD-02 was safe and well

tolerated. Additionally, the results demonstrated positive changes in biomarkers, suggesting a therapeutic effect on fibrosis. More recently, we announced on April 23, 2014, that we have completed the enrollment of all of the required patients in cohort 2 of this Phase 1 clinical trial, and we expect to announce the results around the end of July 2014," said Peter G. Traber, M.D., Chief Executive Officer, President and Chief Medical Officer, Galectin Therapeutics. "This Phase 1 first-in-man study is evaluating the safety, tolerability, pharmacokinetics and exploratory biomarkers for efficacy for single and multiple doses of GR-MD-02 when administered to patients with fatty liver disease with advanced fibrosis."

43. On July 24, 2014, Emerging Growth posted on their website about Galectin:

Fat is driving the bus these days in one narrow, but widening, biotech sector as companies strive for dominance. Among these are Galectin Therapeutics Inc. (GALT), Intercept Pharmaceuticals (ICPT), Raptor Pharmaceuticals (RPTP) and Gilead Sciences (GILD), all of which are in search of a cure for one stage or another of "fatty liver disease."

* * *

From a clinical stage perspective, Intercept is leading the race, having delivered positive data from a Phase 2 trial of obeticholic acid (OCA) earlier this year. Shares tripled on the news. Galectin, a newly-coined member of the Russell 2000, ***is nipping at Intercept's heels*** and actually may be closer than what first appears with a Phase 1 trial because of the potential to treat fatty liver disease even once it has progressed. What distinguishes their approach from others that the timing of intervention with their proprietary carbohydrate polymer drug GR-MD-02 may be largely irrelevant to outcomes, with GR-MD-02 seeming to work well even in advanced stages of liver fibrosis. This is especially important in fatty liver diseases because they are silent killers, often going undiagnosed for many years. The Galectin drug was granted FDA fast-track approval nearly a year ago.

Galectin has announced GR-MD-02 to be safe and well tolerated in the first cohort of patients in its clinical trial, as well as showing changes in key biomarkers, which suggests a therapeutic effect on fibrosis, or scarring of the liver that leads to loss of liver function. Enrollment has been completed in the second cohort, with results expected in the next few weeks, potentially a catalytic moment for the company's value.

Further, late in June Galectin disclosed that research in an animal model of NASH showed an oral version of GR-MD-02 to demonstrate a significant improvement in disease. Coming at NASH with both infused and oral formulations could give Galectin a competitive edge going forward.

* * *

The apparently sudden prevalence of fatty liver disease and NASH on the biotech horizon is due to the increasing incidence of obesity worldwide and

> greater awareness of the conditions. After all, NASH didn't even have a medical name three decades ago. A U.S. Centers for Disease Control report says that 34.9% of American adults are obese. That's a 50% increase in obesity in less than 40 years and has lent impetus to the rise in NASH, a disease dubbed "the next big global epidemic" on CNBC's NBR.
>
> Those are big numbers and potentially big profits. So it is clear that fat is indeed driving the biotech bus, with Galectin, Intercept, Gilead and Raptor in the front seats and vying to take control of the wheel.

44. On the heels of the glowing Emerging Growth posting on its website, the Individual Defendants caused Galectin to issue a press release announcing a conference call on July 25, 2014 to provide updated results from its Phase 1 NASH study.

45. Following these releases, Galectin's stock price spiraled upwards from $13.72 per share to $15.32 per share.

**REASONS STATEMENTS WERE IMPROPER**

46. The true facts, which were known or were recklessly disregarded by the Individual Defendants but concealed from the investing public, were as follows:

(a) the Individual Defendants knew, but concealed, that the Company was utilizing the services of paid stock promoters to disseminate positive, but misleading reports about Galectin's prospects;

(b) GR-MD-02 did not provide the benefits suggested by the Individual Defendants when discussing the patent the Company was awarded or the Phase 1 clinical trial it was conducting; and

(c) as a result of the foregoing, the Company's touted financial and business prospects were materially false and misleading at all relevant times.

47. As a result of the Individual Defendants' false and misleading statements and omissions, Galectin shares traded at artificially inflated prices during the Relevant Period. Once the true facts regarding the Company's financial prospects and future business prospects

emerged, Galectin stock crumbled from its Relevant Period high of $18.30, sinking to a low of $5.15 per share on July 29, 2014, erasing tens of millions of dollars in market capitalization.

**THE TRUTH EMERGES**

48. On July 25, 2014, Feuerstein tweeted "$GALT paying penny stock promoters to issue misleading PRs posted to Y!"

49. On July 28, 2014, Bleecker Street Research published an article on *SeekingAlpha.com* claiming Galectin "has strong ties to stock promoters" and was engaged in a misleading brand awareness campaign aimed at boosting its stock price.

50. On July 28, 2014, Feuerstein published an article on *TheStreet.com* denoting Emerging Growth, through its parent company TDM, a penny-stock promotions firm, was the investor relations and marketing company Galectin was paying for misleading promotional campaigns to entice investors to buy its stock. The article stated in part:

> Last Thursday, Emerging Growth issued a press release, picked up by the Yahoo! Finance feed, which misleadingly compared Galectin to Intercept Pharmaceuticals(ICPT).
>
>> From a clinical stage perspective, Intercept is leading the race, having delivered positive data from a Phase 2 trial of obeticholic acid (OCA) earlier this year. Shares tripled on the news. Galectin, a newly-coined member of the Russell 2000, is nipping at Intercept's heels and actually may be closer than what first appears with a Phase 1 trial because of the potential to treat fatty liver disease even once it has progressed. What distinguishes their approach from others that the timing of intervention with their proprietary carbohydrate polymer drug GR-MD-02 may be largely irrelevant to outcomes, with GRMD-02 seeming to work well even in advanced stages of liver fibrosis. This is especially important in fatty liver diseases because they are silent killers, often going undiagnosed for many years. The Galectin drug was granted FDA fast-track approval nearly a year ago.
>
> Only someone being paid to shill would claim Galectin is "nipping at Intercept's heels." Intercept is way ahead in developing a drug to treats non-alcoholic steatohepatitis (NASH), a severe form of fatty liver disease, and its clinical studies to date have been designed using appropriate endpoints.
>
> Galectin, by comparison, is conducting a phase I "safety" study of its NASH candidate enrolling a tiny number of patients and using endpoints which collect useless biomarker data. It's as if Galectin doesn't really want to find out if their drug is effective against NASH.

> After Emerging Growth's misleading press release was issued Thursday, Galectin followed up with a press release of its own on Friday to announce a conference call for Tuesday morning. The subject of the call: To discuss updated results from its phase I NASH study

51. On July 29, 2014, the Individual Defendants caused Galectin to announce that it had posted a new presentation on its website about the results of the second cohort of patients in its Phase 1 clinical trial. The results were described as "poor" by analysts.

52. Then on July 29, 2014, Feuerstein published an article on *TheStreet.com* entitled "Galectin Drug is a Fatty Liver Flop," which stated in part:

> Fruit pectin is delicious spread on toast, but can an experimental drug derived from fruit pectin be effective as a treatment for fatty liver disease? Not so much, which explains the steep drop in Galectin Therapeutics (GALT) Tuesday.
>
> Galectin's experimental drug GR-MD-02 flopped in a phase I study of nonalcoholic steatohepatitis (NASH), a severe form of fatty liver disease. Across just about every biomarker for efficacy Galectin thought to measure, GR-MD-02 showed no difference from placebo. Galectin deemed the updated results from the phase I study to be a success because patients treated with GR-MD-02 reported no serious side effects, but of course, ineffective placebos rarely raise safety concerns.

52. On this news, Galectin's stock plummeted $8.84 per share to close at $5.70 per share on July 29, 2014, a one-day decline of nearly 61% on extremely heavy trading volume – wiping out more than $190 million in market capitalization.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

### Fiduciary Duties

53. By reason of their positions as officers, directors, and/or fiduciaries of Galectin and because of their ability to control the business and corporate affairs of Galectin, the Individual Defendants owed and owe the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Galectin in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Galectin and its

shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

54. Each director and officer of the Company owes to Galectin and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

55. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

**Audit Committee Duties**

56. In addition to these duties, the members of the Audit Committee owed specific duties to Galectin under the Audit Committee's Charter to review and approve quarterly and annual financial statements and earnings press releases, and to ensure that the Company had appropriate and effective internal controls over financial reporting.

57. Specifically, according to Galectin's Audit Committee Charter, the Audit Committee is responsible for, among other things:

- Providing any recommendations, certifications and reports that may be required by the SEC including the report of the Committee that must be included in the Company's annual proxy statement. As part of the CEO and CFO certification process for the Form 10-K and Form 10-Q, review disclosures concerning any significant deficiencies in the design or operation of disclosure controls and procedures and any fraud involving management or other employees who have a significant role in the Company's internal controls.

- Reviewing and discussing the annual audited financial statements and quarterly financial statements with management and the independent auditor, including major issues regarding accounting, disclosure and auditing procedures and practices as well as the adequacy of internal controls that could materially affect the Company's financial statements.

- Discussing with management the type of presentation and type of information to be included in the Company's earnings press releases and the financial information and earnings guidance provided to, as applicable, analysts and rating agencies.

- Establishing and overseeing procedures for (a) the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters; and (b) the confidential anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

- Discussing with management and the independent auditor the Company's policies with respect to risk assessment and risk management.

- In consultation with, as applicable, the independent auditor, management and the internal auditors, reviewing the integrity of the Company's financial reporting process.

- Reviewing periodically issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements; and the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company.

- Reporting regularly to the Board of Directors.

58. Upon information and belief, the Company maintained an Audit Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on the members of the Audit Committee as those set forth above.

**Duties Pursuant to the Company's Code of Conduct and Ethics**

59. Additionally, the Individual Defendants, as officers and/or directors of Galectin, are bound by the Company's Code of Conduct and Ethics (the "Code") which, according to the Code, was adopted to deter wrongdoing and promote, among other things:

> Full, fair, accurate, timely and understandable disclosure in reports and documents filed with or submitted to the Securities and Exchange Commission and in other public communications made by the Company.

60. With respect to public disclosures, the Code states, in part, that:

> The Company must also disclose to the SEC, our current stockholders and the investing public, information that is required to be disclosed under applicable laws, regulations or rules, and any additional information that may be necessary to ensure that the required disclosures are not misleading or inaccurate. The Company requires you to participate in the disclosure process, which is designed to record, process, summarize and report material information for disclosure, such that the information when disclosed is full, fair, accurate, timely and understandable.

61. Upon information and belief, the Company maintained a version of the Code during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Board, as those set forth above.

**Control, Access, and Authority**

62. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Galectin, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Galectin.

63. Because of their advisory, executive, managerial, and directorial positions with Galectin, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Galectin.

64. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Galectin, and was at all times acting within the course and scope of such agency.

**Reasonable And Prudent Supervision**

65. To discharge their duties, the officers and directors of Galectin were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Galectin were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and

accurate statements to the investing public;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide investors and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

(d) remain informed as to how Galectin conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e) ensure that Galectin was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

**BREACHES OF DUTIES**

66. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to Galectin and its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of Galectin, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Galectin, the absence of good faith on their part, and a reckless disregard for their duties to Galectin and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to Galectin.

67. The Individual Defendants each breached their duties of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

68. In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Securities Class Action that alleges violations of the federal securities laws. As a result, Galectin has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

69. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

70. During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually were. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

71. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties and unjust enrichment; and (b) disguise and misrepresent the Company's actual business and financial prospects.

72. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and

substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

73. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

**DAMAGES TO GALECTIN**

74. As a result of the Individual Defendants' wrongful conduct, Galectin disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made. The improper statements have devastated Galectin's credibility. Galectin has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

75. As a direct and proximate result of the Individual Defendants' actions as alleged above, Galectin's market capitalization has been substantially damaged, losing tens of millions of dollars in value as a result of the conduct described herein.

76. Further, as a direct and proximate result of the Individual Defendants' conduct, Galectin has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

a. costs incurred in investigating and defending Galectin and certain officers in the pending Securities Class Action, plus potentially millions of dollars in settlement or to satisfy an adverse judgment;

b. costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based at least in part on Galectin's artificially-inflated stock price; and

c. costs incurred from the loss of the Company's customers' confidence in Galectin's products.

77. Moreover, these actions have irreparably damaged Galectin's corporate image and goodwill. For at least the foreseeable future, Galectin will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Galectin's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

78. Plaintiff brings this action derivatively in the right and for the benefit of Galectin to redress injuries suffered, and to be suffered, by Galectin as a direct result of the Individual Defendants' breaches of fiduciary duties and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Galectin is named as a nominal defendant solely in a derivative capacity.

79. Plaintiff will adequately and fairly represent the interests of Galectin in enforcing and prosecuting its rights.

80. Plaintiff was a shareholder of Galectin common stock at the time of the wrongdoing of which Plaintiff complains and has been continuously since.

81. Plaintiff did not make a pre-suit demand on the Board to pursue this action, because such a demand would have been a futile and wasteful act.

82. At the time this action was commenced, the Board of Galectin consisted of the following ten directors: Czirr, Martin, Amelio, Freeman, Greenberg, Mauldin, Prelack, Pressler, Rubin, and Traber.

**Demand is Futile as to All Director Defendants Because the Director Defendants Face a Substantial Likelihood of Liability**

83. The Director Defendants face a substantial likelihood of liability for their individual misconduct. The Director Defendants were directors throughout the Relevant Period, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its financial and business prospects were accurate.

84. Moreover, the Director Defendants, as directors (and, in some cases, also as Audit Committee members) owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls and/or internal auditing and accounting controls over financial reporting were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence and due care. Instead, they knowingly and/or with reckless disregard reviewed, authorized and/or caused the publication of materially false and misleading statements throughout the Relevant Period that caused the Company's stock to trade at artificially inflated prices.

85. The Director Defendants also wasted corporate assets by paying improper compensation, bonuses, and severance to certain of the Company's executive officers and directors. The handsome remunerations paid to wayward fiduciaries who proceeded to breach their fiduciary duties to the Company was improper and unnecessary, and no person of ordinary, sound business judgment would view this exchange of consideration for services rendered as fair or reasonable.

86. The Director Defendants' making or authorization of false and misleading statements throughout the Relevant Period, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls or internal

auditing and accounting controls were sufficiently robust and effective (and/or were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence, and/or acts of corporate waste and abuse of control constitute breaches of fiduciary duties, for which the Director Defendants face a substantial likelihood of liability. If the Director Defendants were to bring a suit on behalf of Galectin to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. This is something they will not do. For this reason demand is futile.

**Demand is Futile as to the Audit Committee Defendants**

87. The Audit Committee Defendants were responsible for, among other things, reviewing and approving quarterly and annual financial statements and earnings press releases, overseeing Galectin's internal controls over financial reporting, and discharging their other duties described herein. Despite these duties, the Audit Committee Defendants knowingly or recklessly reviewed and approved, or failed to exercise due diligence and reasonable care in reviewing and preventing the dissemination of false and/or materially misleading earnings press releases and earnings guidance and failed in their specific duties to ensure that the Company's internal controls over financial reporting were sufficient and that statements made by the Company regarding its business and financial prospects were accurate. Accordingly, the Audit Committee Defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith. Any demand upon the Audit Committee Defendants therefore is futile.

**Demand is Futile as to Defendant Traber for Additional Reasons**

88. In addition to the reasons discussed herein as to why demand is futile as to all Director Defendants, demand is futile as to Traber because Traber is not an independent director.

89. Traber also cannot disinterestedly consider a demand to bring suit against himself because Traber is a named defendant in the Securities Class Action which alleges that he made many of the same misstatements described above in violation of the federal securities laws. Thus, if Traber were to initiate suit in this action he would compromise his ability to simultaneously defend himself in the Securities Class Action and would expose himself to liability in this action. This he will not do.

90. Demand is futile for the additional reason that Traber is an employee of the Company who derives substantially all of his income from his employment with Galectin, making him, as acknowledged by the Company in its most recent Proxy dated April 7, 2014, not independent. As such, Traber cannot independently consider any demand to sue himself for breaching his fiduciary duties to Galectin, because that would expose him to liability and threaten his livelihood.

**Demand is Futile as to Defendant Czirr for Additional Reasons**

91. In addition to the reasons discussed herein as to why demand is futile as to all Director Defendants, demand is futile as to Czirr because Czirr is not an independent director.

92. Czirr also cannot disinterestedly consider a demand to bring suit against himself because Czirr is a named defendant in the Securities Class Action which alleges that he made many of the same misstatements described above in violation of the federal securities laws. Thus, if Czirr were to initiate suit in this action he would compromise his ability to simultaneously defend himself in the Securities Class Action and would expose himself to liability in this action. This he will not do.

93. Demand is futile for the additional reason that Czirr is an executive officer of the Company who derives substantial income from his employment with Galectin, making him, as acknowledged by the Company in its most recent Proxy dated April 7, 2014, not independent.

As such, Czirr cannot independently consider any demand to sue himself for breaching his fiduciary duties to Galectin, because that would expose him to liability and threaten his livelihood.

**Demand is Futile Because Czirr and Martin Control the Board**

94. Demand is also excused because the Director Defendants, as members of the Board, are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action since, in addition to their participation or approval in the wrongs alleged herein, each of the Director Defendants are controlled by Czirr and Martin.

95. In 2009, Czirr and Martin led a takeover of the Company.

96. Czirr and Martin are also co-founders of the 10X Fund, L.P.

97. As of March 19, 2014, 10X Fund L.P. – which is controlled by Martin and Czirr - is the owner of all of the issued and outstanding shares of Galectin Series B preferred stock.

98. As holders of Galectin Series B preferred stock, 10X Fund L.P. has the right to, among other things, vote as a separate class to nominate and elect two directors, referred to as the Series B directors, and to nominate three directors, referred to as the Series B nominees, who must be recommended for election by holders of all of Galectin's securities entitled to vote on election of directors. In fact, Czirr is the Series B director.

99. In addition to controlling all of the issued and outstanding shares of the Series B preferred stock, Czirr, Martin, and 10X Fund L.P., collectively, own a significant amount of the Company's common stock.

100. Czirr and Martin serve as Executive Chairman and Vice Chairman of the Board, respectively.

101. Due to their significant business ties with one another, Czirr and Martin are beholden to one another.

102. Further, because of the influence each has as a result of their positions on the Board and ownership of all of the Series B preferred stock and significant holdings of the Company's common stock, the remaining Director Defendants are beholden to Czirr and Martin.

103. As such, demand is futile.

**Demand is Futile as to All Directors for Additional Reasons**

104. If Galectin's current officers and directors are protected against personal liability for their breaches of fiduciary duties alleged in this complaint by Directors & Officers Liability Insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the shareholders. However, Plaintiff is informed and believes that the D&O Insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by Galectin against the Individual Defendants, known as the "insured versus insured exclusion."

105. As a result, if the Director Defendants were to sue themselves or certain of the officers of Galectin, there would be no D&O Insurance protection, and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. Therefore, the Director Defendants cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy.

106. Under the factual circumstances described herein, the Individual Defendants are more interested in protecting themselves than they are in protecting Galectin by prosecuting this action. Therefore, demand on Galectin and its Board is futile and is excused.

107. Galectin has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing. Yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct. Thus, the Director Defendants are breaching their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

108. Plaintiff has not made any demand on shareholders of Galectin to institute this action since such demand would be a futile and useless act for the following reasons:

a. Galectin is a publicly traded company with thousands of shareholders of record;

b. Making demand on such a number of shareholders would be impossible for Plaintiff, who has no means of collecting the names, addresses, or phone numbers of Galectin shareholders; and

c. Making demand on all shareholders would force Plaintiff to incur excessive expense and obstacles, assuming all shareholders could even be individually identified with any degree of certainty.

**COUNT I**

**Against The Individual Defendants For Breach Of Fiduciary Duties**

109. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

110. The Individual Defendants owed and owe Galectin fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Galectin the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight and supervision.

111. The Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight and supervision.

112. The Individual Defendants each knowingly, recklessly or negligently approved the issuance of false statements that misrepresented and failed to disclose material information concerning the Company. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

113. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Galectin has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

114. Plaintiff, on behalf of Galectin, has no adequate remedy at law.

**COUNT II**

**Against All Defendants For Unjust Enrichment**

115. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

116. By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of Galectin.

117. The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Galectin.

118. Plaintiff, as a shareholder and representative of Galectin, seeks restitution from Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct and fiduciary breaches.

119. Plaintiff, on behalf of Galectin, has no adequate remedy at law.

**COUNT III**

**Against The Individual Defendants For Waste Of Corporate Assets**

120. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

121. The wrongful conduct alleged regarding the issuance of false and misleading statements, was continuous, connected, and on-going throughout the Relevant Period. It resulted in continuous, connected, and on-going harm to the Company.

122. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (i) by paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

123. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

124. Plaintiff, on behalf of Galectin, has no adequate remedy at law.

**COUNT IV**

**Against All The Individual Defendants For Aiding And Abetting Fiduciary Violations**

125. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

126. The wrongful conduct alleged herein was continuous, connected, and on-going since at least January 6, 2014. The Individual Defendants' misconduct resulted in continuous, connected, and on-going harm to the Company.

127. The Individual Defendants had the power and/or ability to, and did, directly or indirectly control or influence the Company's general affairs, including the content of public statements disseminated by Galectin and had the power and/or ability directly or indirectly to control or influence one another.

128. Each Individual Defendant is jointly and severally liable to the same extent as any other Defendant is liable for breaches of fiduciary duties as set forth herein or violations of any other laws.

129. As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

130. Plaintiff, on behalf of Galectin, has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A. Against all Defendants for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties, aiding and abetting breaches of fiduciary duties, unjust enrichment, and waste of corporate assets;

B. Directing Galectin to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Galectin and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following corporate governance proposals or policies:

- a proposal to strengthen the Board's supervision of operations and compliance with applicable state and federal laws and regulations;
- a proposal to strengthen the Company's internal reporting and financial disclosure controls;
- a proposal to develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;
- a proposal to ensure the accuracy of the qualifications of Galectin directors, executives and other employees;
- a proposal to require an independent Chairman of the Board;
- a proposal to strengthen the Company's procedures for the receipt, retention and treatment of complaints received by the Company regarding internal controls; and
- a provision to appropriately test and then strengthen the Company's internal operational control functions;

C. Awarding to Galectin restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

D. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: August 1, 2014

LEVERTY & ASSOCIATES LAW CHTD.
PATRICK R. LEVERTY

/S/ *Patrick Leverty*
PATRICK R. LEVERTY (8840)
pat@levertylaw.com
832 Willow Street
Reno, NV 89502
Telephone: (775) 322-6636
Facsimile: (775) 322-3953

JOHNSON & WEAVER, LLP
Frank J. Johnson *(to be admitted pro hac vice)*
frankj@johnsonandweaver.com
Nathan R. Hamler *(to be admitted pro hac vice)*
nathanr@johnsonandweaver.com
110 West "A" Street, Suite 750
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856

*Attorneys for Plaintiff*
*David L. Hasbrouck*

# VERIFICATION

I, David L. Hasbrouck, verify that I have reviewed the foregoing Verified Shareholder Derivative Complaint, and that the allegations as to me are true and correct and that the other allegations upon information and belief are true and correct.

Dated: August 1, 2014

DocuSigned by:



428AE31440B2426...

(Signature of David L. Hasbrouck)