**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**

IN RE GALECTIN THERAPEUTICS, INC.
DERIVATIVE LITIGATION

Lead Case No. 1:15-CV-00208-SCJ

<u>**VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

## TABLE OF CONTENTS

**Page**

NATURE AND SUMMARY OF THE ACTION ......................................................1

JURISDICTION AND VENUE .........................................................................6

THE PARTIES..............................................................................................7

FACTUAL ALLEGATIONS .........................................................................10

    Company Background .........................................................................10

    The Individual Defendants' Illicit Scheme ...........................................13

    The Individual Defendants and Emerging Growth/TDM Secretly Work In
    Concert, Issuing Optimistic and Misleading Press Releases In an Effort to Pump
    Up Galectin's Stock Price .................................................................14

REASONS THE INDIVIDUAL DEFENDANTS' STATEMENTS WERE IMPROPER........50

THE TRUTH EMERGES................................................................................50

INSIDER SELLING .....................................................................................53

DUTIES OF THE INDIVIDUAL DEFENDANTS ..................................................55

    Fiduciary Duties................................................................................55

    Audit Committee Duties .....................................................................57

    Duties Pursuant to the Company's Code of Conduct and Ethics ..................59

    Governance Committee Duties ............................................................60

    Control, Access, and Authority............................................................60

    Reasonable And Prudent Supervision....................................................61

BREACHES OF DUTIES ..............................................................................62

CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION ....................62

DAMAGES TO GALECTIN ..........................................................................63

DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS .....................................64

    Direct Interestedness Based on Challenged Insider Sales ...........................66

    Demand is Futile as to All Director Defendants Because the Director Defendants
    Face a Substantial Likelihood of Liability In Connection with the Secret Stock
    Promotion Scheme .........................................................................66

i

## **TABLE OF CONTENTS (cont.)**

**Page**

Demand is Futile as to the Audit Committee Defendants.................................................68

Demand Is Futile as to the Governance Committee Defendants ....................................69

Demand is Futile as to Defendant Traber for Additional Reasons ................................69

Demand is Futile as to Defendant Czirr for Additional Reasons...................................70

Demand is Futile Because Czirr and Martin Control the Board ....................................71

COUNT I  Against The Individual Defendants For Violations Of Section 14(a) Of The Securities Exchange Act Of 1934 ...............................................................................72

COUNT II  Against The Individual Defendants For Breaches Of Fiduciary Duties................74

COUNT III  Against The Insider Selling Defendants For Breaches Of Fiduciary Duties For Insider Selling And Misappropriation Of Information..........................................75

COUNT IV  Against The Individual Defendants For Unjust Enrichment ...............................76

COUNT V  Against The Individual Defendants For Waste Of Corporate Assets ....................77

COUNT VI  Against The Individual Defendants For Aiding And Abetting Fiduciary Violations.....................................................................................................................78

PRAYER FOR RELIEF ........................................................................................................78

ii

By and through their undersigned counsel, Plaintiffs David L. Hasbrouck ("Hasbrouck") and Sui Yip ("Yip") (together, "Plaintiffs") bring this shareholder derivative action on behalf of Nominal Defendant Galectin Therapeutics, Inc. ("Galectin" or the "Company") against certain current and/or former officers and directors of the Company for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and violations of Nevada law, including breaches of fiduciary duties, insider selling and misappropriation of information, unjust enrichment, corporate waste, and aiding and abetting thereof, from July 2013 to the present (the "Relevant Period"). Plaintiffs make these allegations upon personal knowledge as to those allegations concerning Plaintiffs and, as to all other matters, upon the investigation of counsel, which includes, without limitation: (a) review and analysis of public filings made by Galectin and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the defendants and other related non-parties; (c) review of news articles, shareholder communications, and postings on Galectin's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with and publicly available from the related pending securities fraud class action, *In re Galectin Therapeutics, Inc. Securities Litigation*, Consolidated Case No. 1:15-cv-00029-SCJ (the "Securities Class Action"); and (e) review of other publicly available information concerning Galectin and the Individual Defendants (defined below).

## NATURE AND SUMMARY OF THE ACTION

1. This case is about a secret "stock promotion" scheme by which the Individual Defendants hired a "stock promotion firm" to conduct a misleading campaign designed to boost Galectin's stock price. The Individual Defendants' scheme, which was not disclosed to or approved by stockholders, was simple. The stock promotion firm hired at the Individual

Defendants' direction would publish a series of misleading articles, touting the supposed strength of Galectin and its lead product candidate.  These "articles" never disclosed that, in fact, Galectin (under the Individual Defendants' direction and on their watch) paid for the promotion.  The stock promotion scheme worked until July 28, 2014, when multiple articles were published by *TheStreet.com* and *SeekingAlpha.com* exposing the scheme, and Galectin's stock price immediately cratered.  Before the scheme was uncovered and Galectin's stock plummeted, however, certain of the Individual Defendants (including directors of Galectin) sold or caused to be sold shares of Galectin stock at artificially inflated prices.  Further, the Individual Defendants utilized the Company's bloated stock price to raise more than $30 million in much needed cash to develop the Company's lead product candidate (and thus secure their lucrative positions as directors and/or senior officers with the Company).

2.      Galectin is a development stage company engaged in the research and development of therapies for fibrotic disease and cancer.  According to its public filings, "the Company is developing promising carbohydrate-based therapies for the treatment of fibrotic liver disease and cancer based on the Company's unique understanding of galectin proteins, key mediators of biologic function.   [The Company is] leveraging extensive scientific and development expertise as well as established relationships with external sources to achieve cost effective and efficient development.  [The Company is] pursuing a clear development pathway to clinical enhancement and commercialization for [its] lead compounds in liver fibrosis and cancer."

3.      The Company's lead product candidate is GR-MD-02, a complex polysaccharide polymer which is being tested for the treatment of liver fibrosis and fatty liver disease

("NASH").  During the Relevant Period, the development of GR-MD-02 was the Company's primary focus.[1]

4.      However, Galectin was running low on cash and the Individual Defendants needed to raise money quickly in order to develop GR-MD-02.  But, with a stagnant stock price, raising the necessary funds would prove to be difficult.  So, beginning in July 2013, the Individual Defendants either issued or caused the Company to issue a series of false and misleading statements concerning the Company's financial and business prospects and its lead product candidate, GR-MD-02, in order to "pump up" the Company's stock price.  By doing so, the Individual Defendants could leverage Galectin's artificially inflated stock price to raise much needed cash to develop GR-MD-02, and in turn, secure their positions at the Company.

5.      In order to assist with their scheme, the Individual Defendants secretly and illicitly retained Emerging Growth Corp. (also known as Emerging Growth LLC) ("Emerging Growth"), through its parent company TDM Financial ("TDM") – a penny stock promotion firm – to commence a misleading promotional campaign to entice investors to buy Galectin stock. Most of the "articles" that were issued in connection with this campaign were published via special press releases issued by Emerging Growth.  Notably, Emerging Growth did not promote the Company's products to potential customers, or even possible partners.  Rather, the sole focus of Emerging Growth/TDM's campaign was promoting the Company's stock on various investment mediums.

6.      The Individual Defendants and Emerging Growth/TDM would work in concert with one another during the Relevant Period, as Emerging Growth/TDM would issue a series of "articles" on the heels of positive press releases the Individual Defendants caused the Company to release during the Relevant Period regarding the Phase 1 study of GR-MD-02.  The Individual

---

[1]  The Company's only other compound in development, GM-CT-01, which is being developed for use in treating cancer, has been placed on hold according to the Company's public disclosures.  At the time it was placed on hold, GM-CT-01 was in Phase 1/2 trials.

Defendants never disclosed this scheme to shareholders, nor did they ever seek shareholder approval for such a scheme. Moreover, the Individual Defendants failed to disclose that GR-MD-02 did not provide the benefits suggested by the Individual Defendants when discussing the patent the Company was awarded or the Phase 1 clinical trial it was conducting.

7. The Individual Defendants' well-orchestrated propaganda campaign worked like a charm, as the Company's stock price *more than tripled* from its opening price of just $4.25 per share on July 1, 2013 to close at $14.54 per share on July 28, 2014 – allowing the Individual Defendants to raise more than $30 million in much needed cash by selling artificially inflated Galectin stock.

8. At the same time the Individual Defendants were causing the issuance of false and misleading statements and using the Company's bloated stock price to raise much needed cash, certain of the Individual Defendants (all directors of Galectin) took advantage of the Company's "pumped up" stock price for their own personal gain by dumping shares of Galectin (or, in some cases, causing shares of Galectin to be sold through entities owned and/or controlled by them) at artificially inflated prices valued at *more than $3.125 million*. Notably, this was the first time in years, since February 2009, when the Company was known as Pro-Pharmaceuticals, Inc. ("Pro-Pharmaceuticals"), that any Galectin directors or officers had sold Company stock.

9. The Individual Defendants' and Emerging Growth/TDM's secret scheme could only last so long, however. It all began to unravel when on July 28, 2014, Bleecker Street Research published an article on *SeekingAlpha.com* reporting that Galectin "has strong ties to stock promoters," and was engaging in a misleading brand awareness campaign aimed at boosting its stock price.

10. Later that day, on July 28, 2014, Adam Feuerstein ("Feuerstein"), a senior columnist for *TheStreet.com*, shed more light on the scheme by revealing that Emerging Growth,

through its parent company TDM, was the investor relations and marketing company Galectin has been paying for a misleading promotional campaigns to entice investors to buy its stock.

11.     The news went from bad to worse when on July 29, 2014, the Individual Defendants caused Galectin to announce that it had posted a new presentation on its website about the results of the second cohort of patients in its Phase 1 clinical trial.  These results were described as "poor" by analysts.  Indeed, Feuerstein published an article later that day on *TheStreet.com* bluntly entitled "Galectin Drug is a Fatty Liver Flop," noting, among other things, that "*[a]cross just about every biomarker for efficacy Galectin thought to measure, GR-MD-02 showed no difference from placebo.*"

12.     As the Individual Defendants' scheme unraveled, so did Galectin's stock price as investors fled.  Indeed, the price of Galectin stock cratered, falling by $8.84 per share to close at $5.70 per share on July 29, 2014 – a drop of *more than 60%* - and decimating Galectin's market capitalization *by more than $190 million in a single day*.

13.     As a result of the Individual Defendants' misconduct, Galectin's common stock traded at artificially inflated levels during the Relevant Period.  When the truth regarding the Company's secret use of a stock promoter coupled with the "poor" performance of GR-MD-02 were announced, the Company's share price plunged, erasing nearly two hundred million dollars in market capitalization.

14.     Galectin's Board of Directors (the "Board") has not commenced, and will not commence, litigation against the Individual Defendants named in this Complaint, let alone vigorously prosecute such claims, because, among other things, a majority of the members of the Board are directly interested in the personal financial benefits challenged herein that were not shared with Galectin shareholders, and/or face a substantial likelihood of liability to Galectin for breaching their fiduciary duties of loyalty and good faith by authorizing or failing to correct the

false and misleading statements alleged herein, and/or lack independence.  Accordingly, a pre-suit demand upon Galectin's Board was and is a useless and futile act.  Thus, Plaintiffs rightfully bring this action to vindicate Galectin's rights against its wayward fiduciaries and hold them responsible for the damages they have caused to Galectin.

**JURISDICTION AND VENUE**

15.    The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question.  The Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

16.    The Court has jurisdiction over each defendant because each defendant is either a corporation that does sufficient business in Georgia, or is an individual who has sufficient minimum contacts with Georgia so as to render the exercise of jurisdiction by the Georgia courts permissible under traditional notions of fair play and substantial justice.  Venue is proper in this District pursuant to 28 U.S.C. §1391 because one or more of the defendants either resides in or maintains executive offices in this District, including Nominal Defendant Galectin, a substantial portion of the transactions and wrongs complained of herein – including the Individual Defendants' primary participation in the wrongful acts detailed herein occurred in this District, and the Individual Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

17.    In connection with the acts and conduct alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## THE PARTIES

18.     Plaintiff Hasbrouck is a current shareholder of Galectin and has continuously held Galectin stock since 2003, when the Company was known as Pro-Pharmaceuticals.

19.     Plaintiff Yip is a current shareholder of Galectin and has continuously held Galectin stock since February 2007, when the Company was known as Pro-Pharmaceuticals.

20.     Nominal Defendant Galectin is incorporated in Nevada with its principal place of business located at 4960 Peachtree Industrial Boulevard, Suite 240, Norcross, Georgia 30071. Galectin is a development stage company engaged in the research and development of therapies for fibrotic disease and cancer.  According to the Company's most recent Annual Report on Form 10-K (the "2013 10-K"), filed with the SEC on March 21, 2014, Galectin has only six full-time employees and two contractors.  The Company's common stock is traded on the NASDAQ Capital Markets under the ticker symbol "GALT."  The Company has more than 21 million shares outstanding.

21.     Defendant Peter G. Traber ("Traber") has served as Galectin's President and Chief Executive Officer ("CEO") since March 2011 and as a director of the Company since February 2009.  Traber also currently serves as the Company's Chief Medical Officer ("CMO"). Traber is an individually named defendant in the Securities Class Action.  Traber received $612,690 in total compensation from Galectin in 2013 and $1,089,299 in total compensation from Galectin in 2012.

22.     Defendant James C. Czirr ("Czirr") has served as Chairman of the Board since February 2009 and as Executive Chairman since February 2010.  Czirr co-founded Galectin in July 2000, and in 2009 he, along with defendant Rod D. Martin ("Martin"), led the takeover of Galectin.  Czirr, along with Martin, is also the co-founder of 10X Fund, L.P. ("10X Fund") and is a managing member of 10X Capital Management, LLC, the general partner of 10X Fund.  As

of March 19, 2014, 10X Fund is the owner of all of the issued and outstanding shares of Galectin Series B preferred stock.  As holders of Galectin Series B preferred stock, 10X Fund has the right to, among other things, vote as a separate class to nominate and elect two directors, referred to as the Series B directors, and to nominate three directors, referred to as the Series B nominees, who must be recommended for election by holders of all of Galectin's securities entitled to vote on election of directors.  Czirr is the Series B director.  Czirr is an individually named defendant in the Securities Class Action.  Czirr received $437,214 in total compensation from Galectin in 2013 and $292,192 in total compensation from Galectin in 2012.  During the Relevant Period, while in possession of material, adverse, non-public information, Czirr, along with defendant Martin, caused the 10X Fund to sell 212,000 shares of Galectin common stock for proceeds exceeding $2.8 million at artificially inflated prices.

23.    Defendant Jack W. Callicutt ("Callicutt") has served as the Chief Financial Officer ("CFO") of the Company since July 2013.  Callicutt is an individually named defendant in the Securities Class Action.  Callicutt received $853,919 in total compensation from Galectin in 2013.

24.    Defendant Gilbert F. Amelio ("Amelio") has served as a director of the Company since February 2009.  During the Relevant Period, Amelio was a member of the Board's Nominating and Corporate Governance Committee (the "Governance Committee") and the Board's Compensation Committee (the "Compensation Committee").

25.    Defendant Kevin D. Freeman ("Freeman") has served as a director of the Company since May 2011.  During the Relevant Period, Freeman was a member of the Board's Audit Committee (the "Audit Committee").

8

26.     Defendant Arthur R. Greenberg ("Greenberg") has served as a director of the Company since August 2009.  During the Relevant Period, Greenberg was a member of the Audit Committee and the Compensation Committee.

27.     Defendant Martin has served as Vice Chairman of the Board since February 2010 and as a director of the Company since February 2009 when he, along with defendant Czirr, led a takeover of the Company.  Martin, along with defendant Czirr, is the co-founder of 10X Fund and is a managing member of 10X Capital Management, LLC, the general partner of 10X Fund. As of March 19, 2014, 10X Fund is the owner of all of the issued and outstanding shares of Galectin Series B preferred stock.  During the Relevant Period, Martin was the Chairperson of both the Compensation Committee and the Governance Committee.  During the Relevant Period, while in possession of material, adverse, non-public information, Martin, along with defendant Czirr, caused the 10X Fund to sell 212,000 shares of Galectin common stock for proceeds exceeding $2.8 million at artificially inflated prices.

28.     Defendant John F. Mauldin ("Mauldin") has served as a director of the Company since May 2011.

29.     Defendant Steven Prelack ("Prelack") has served as a director of the Company since April 2003.  During the Relevant Period, Prelack served as Chairperson of the Audit Committee.  During the Relevant Period, while in possession of material, adverse, non-public information, Prelack disposed of 23,772 shares of his personally-held Galectin common stock for proceeds of approximately $314,000 at artificially inflated prices.

30.     Defendant Herman Paul Pressler, III ("Pressler") has served as a director of the Company since May 2011.  During the Relevant Period, Pressler was a member of the Governance Committee.

31.     Defendant Dr. Marc Rubin ("Rubin") has served as a director of the Company since October 2011.

32.     Defendants identified in ¶¶21-31 are sometimes referred to herein as the "Individual Defendants."

33.     Defendants identified in ¶¶21-22, 24-31 are sometimes referred to herein as the "Director Defendants."

34.     Defendants identified in ¶¶25, 26, and 29 are sometimes referred to herein as the "Audit Committee Defendants."

35.     Defendants identified in ¶¶24, 27, and 30 are sometimes referred to herein as the "Governance Committee Defendants."

36.     Defendants identified in ¶¶22, 27, and 29 are sometimes referred to herein as the "Insider Selling Defendants."

## FACTUAL ALLEGATIONS[2]

**Company Background**

37.     Galectin is a development stage company engaged in the research and development of therapies for fibrotic disease and cancer.  Specifically, according to its public filings, "the Company is developing promising carbohydrate-based therapies for the treatment of fibrotic liver disease and cancer based on the Company's unique understanding of galectin proteins, key mediators of biologic function.  [The Company is] leveraging extensive scientific and development expertise as well as established relationships with external sources to achieve cost effective and efficient development.  [The Company is] pursuing a clear development pathway to clinical enhancement and commercialization for [its] lead compounds in liver fibrosis and cancer."  According to the Company's 2013 10-K filed with the SEC on March 21, 2014, Galectin has just six full-time employees.

---

[2]  All emphasis is added unless otherwise noted.

38.    Galectin's predecessor company – Pro-Pharmaceuticals - was founded in July 2000 as Pro-Pharmaceuticals, and was at that time both headquartered and incorporated in Massachusetts.   Pro-Pharmaceuticals developed drugs made from fruit pectins which were supposed to bind to and block galectins.  Galectins are a family of glue-like proteins believed to be associated with various diseases when found at elevated levels in the body.

39.    In April 2001, DTR-Med Pharma Corp. ("DTR"), a Nevada corporation, and Pro-Pharmaceuticals entered into a stock exchange agreement with DTR acquiring all of the then-outstanding shares of Pro-Pharmaceuticals common stock, following which, in May 2001, DTR changed its name to Pro-Pharmaceuticals.  Finally, in June 2001, the Massachusetts corporation was merged into the Nevada corporation.

40.    Interestingly, in 2004, Pro-Pharmaceuticals was sued by its former head of investor relations, Sheila Jayaraj ("Jayaraj"), for wrongful discharge.  Jayaraj alleged, among other things, that Pro-Pharmaceuticals had violated the federal securities laws by hiring an unqualified stock promoter (a convicted felon), misleading investors at a meeting to pitch the private sale of its shares, and making exaggerated claims about the prospects for its experimental cancer drug.  Additionally, Pro-Pharmaceuticals also reportedly paid consulting fees to four of its then-directors, including at least $194,000 to defendant Czirr, compromising their independence. These allegations caught the attention of both the SEC and the Massachusetts Division of Securities, each of which launched investigations into Pro-Pharmaceuticals.

41.    The experimental cancer drug at the time of the whistleblower lawsuit and investigations was known as Davanat, and was Pro-Pharmaceuticals' lead galectin inhibitor. Specifically, Davanat was being developed as a boosting agent for the chemotherapy treatment used in colon cancer patients.  Even though Phase I and Phase II studies showed little clinical activity, in June 2007, Pro-Pharmaceuticals claimed that it was in the process of seeking U.S.

11

Food and Drug Administration ("FDA") approval for Davanat, a claim it would continue to make through 2008.

42.     In 2009, Pro-Pharmaceuticals finally admitted publicly that the FDA actually requested that Pro-Pharmaceuticals conduct a Phase III study of Davanat in colon cancer. Although Pro-Pharmaceuticals spent the next two years purportedly discussing plans to conduct the Phase III study requested by the FDA, such a study never happened.

43.     Then, on May 26, 2011, Pro-Pharmaceuticals changed its name to Galectin Therapeutics, Inc., and in October 2012, the Company relocated its headquarters to Atlanta, Georgia.  The Company also rebranded the name of its failed cancer drug, formerly known as Davanat, to GM-CT-01, which the Company claimed it was now developing as a cancer immunotherapy capable of activating a patient's T cells to identify and eliminate cancerous tumors.  In Galectin's most recent 10-K, filed with the SEC on March 21, 2014, the Individual Defendants disclosed that the trial for GM-CT-01 has been placed on hold.

44.     Despite the Company's 2011 name change and the 2012 relocation of its corporate headquarters, many familiar faces nonetheless remained at Galectin.  Indeed, defendants Traber, Amelio, Czirr, Greenberg, Martin, and Prelack, each of whom had been directors of Pro-Pharmaceuticals since at least 2009, remained on Galectin's Board and/or in executive roles.

45.     With all mileage exhausted from Davanat/GM-CT-01, and that drug essentially out of the picture, the Individual Defendants' focus turned to GR-MD-02 to treat NASH, a disease that leads to fatty buildup in the liver and can potentially lead to cirrhosis and/or liver cancer.  Indeed, as the Individual Defendants have admitted in the Company's 2013 Form 10-K, filed on March 21, 2014, the Company "is currently focus[ed] on" GR-MD-02, making it Galectin's lead product candidate throughout the Relevant Period.

12

46.     While the Company's product focus has shifted through the years, one thing has remained a constant – its inability to make money.  Specifically, the Company incurred net losses in each year of operation since its inception in July 2000, with an accumulated deficit as of December 31, 2013 of $102 million and a cumulative net loss applicable to common stock holders as of December 31, 2013 of $102.2 million.  Indeed, as of June 30, 2013, the Company had just $5.1 million of non-restricted cash and cash equivalents which it claimed would only fund operations and planned research and development through the first quarter of 2014.

47.     With a long history of failed products and losses, and faced with dwindling cash at a time when they were attempting to develop the Company's lead (and really only) drug candidate, by the start of the Relevant Period, the Individual Defendants apparently concluded that they needed to generate excitement around Galectin, GR-MD-02, and most importantly, the Company's stagnant stock price, in order to raise much needed cash (and secure their positions at the Company in the process), and for the Insider Selling Defendants to cash in on their Galectin investment.

**The Individual Defendants' Illicit Scheme**

48.     Beginning in July 2013, seeking to ignite Galectin's stagnant stock price and lure unsuspecting investors into the fold, the Individual Defendants began a secret, paid stock promotion campaign to pump-up Galectin's stock price.  The plan was twofold – first, causing the Company to flood investors with a series of facially positive news announcements concerning GR-MD-02, while at the same time, causing the Company to secretly pay a stock promoter to underscore the promise of GR-MD-02 as well as Galectin's prospects and outlook in order to help prop-up the Company's stock price.

49.     Specifically, the Individual Defendants – unbeknownst to investors and the public – secretly and illicitly retained Emerging Growth, through its parent company TDM, a penny

13

stock promotion firm, to conduct a misleading promotional campaign designed to entice investors to buy Galectin stock.

50.    Notably, Emerging Growth/TDM did not promote the Company's products to potential customers, or even possible partners.  Rather, its sole focus was to promote the Company's stock on various investment mediums.  And Emerging Growth/TDM specifically targeted retirees in particular.

51.    When the Individual Defendants' scheme with Emerging Growth/TDM was hatched in July 2013, Galectin stock was trading for approximately $4 per share.

**The Individual Defendants and Emerging Growth/TDM Secretly Work In Concert, Issuing Optimistic and Misleading Press Releases In an Effort to Pump Up Galectin's Stock Price**

52.    The Individual Defendants began their propaganda campaign on July 1, 2013, when they caused the Company to issue a press release entitled: "Galectin Therapeutics Submits Fast Track Application to FDA for GR-MD-02 in Treatment of Fatty Liver Disease with Advanced Fibrosis."  In the press release, defendant Traber enthusiastically boasted that "Fast Track designation from FDA would effectively open many important regulatory pathways to efficiently expedite patient access and will be highly beneficial to advancing the development program for GR-MD-02 in the treatment of NASH with advanced fibrosis."

53.    On the heels of the Individual Defendants' announcement that the Company had filed an application for "Fast Track" designation with the FDA, on July 17, 2013, Emerging Growth published an article entitled: "Hepatitis C Important, But Investors Should be Focusing on Fatty Liver Disease and Galectin" authored by Andrew Klips ("Klips"), and disseminated via *Accesswire*.[3]  The purported "article" touted Galectin as an "undervalued" investment, stating, in pertinent part:

---

[3]   Available at http://www.marketwatch.com/story/hepatitis-c-important-but-investors-should-be-focusing-on-fatty-liver-disease-and-galectin-2013-07-17.

With no FDA-approved drugs available today, investors would be well served to monitor the "Fast Track" application with the FDA and the future results of the Galectin trial to glean information for the company to potentially pursue all available FDA programs to expedite development of the drug candidate. GR-MD-02 could prove to be a broad spectrum therapeutic for liver inflammation and related diseases, including cryptogenic cirrhosis ("cryptogenic" meaning the cause is unknown), a leading cause of liver failure and now believed to be a late stage of NASH. No options for patients today and projections that fatty liver disease will soon become the number one reason for liver transplants seem to be the drivers behind GALT shares rising 120 percent in 2013, *but a paltry $75 million market capitalization indicates the company is undervalued compared to peers in the space*.

54.     Then, on July 24, 2013, the Individual Defendants caused the Company to issue another press release entitled, "Galectin Therapeutics Announces First Patient Dosed in Phase 1 Trial of GR-MD-02, a Potential First-in-Class Treatment for Fatty Liver Disease with Advanced Fibrosis," which defendant Traber referred to as a "critical milestone in Galectin's development program." Defendant Traber further represented that "this milestone takes [the Company] one step closer to bringing a first-in-class treatment to the millions of Americans suffering from this silent epidemic."

55.     Without delay, on July 25, 2013, Emerging Growth/TDM published another article, this time authored by Justin Kuepper ("Kuepper"), entitled: "Galectin Therapeutics (GALT) Doses First Patients with Fatty Liver Disease"[4] noting, in pertinent part:

With no treatments for fatty liver disease with advanced fibrosis currently available, the company's GR-MD-02 represents a potential first-in-class treatment to the nine million to 15 million Americans, including children, which are affected by the silent epidemic. The only alternative for these patients is a transplant, but there are limited donors available and the procedure is very costly, *making this treatment extremely valuable to both the company and its potential patients*.

*             *             *

*Investors in fibrosis-focused stocks like Vertex Pharmaceuticals Inc. (NASDAQ: VRTX) or cancer-related stocks like Exelixis Inc. (NASDAQ:*

---

[4] Article available at
http://secfilings.com/News.aspx?title=galectin_therapeutics_(galt)_doses_first_patients_with_fatty_liver_disease&naid=480.

15

*EXEL) may want to take a closer look at the stock as it progresses through these clinical trials, particularly as it may be approved for fast-track status.*

56.     During July 2013, Galectin stock increased by $1.54 per share, or nearly **26%**, rising from $4.41 per share on July 1, 2013 to close at $5.95 per share on July 31, 2013.

57.     Looking to continue the momentum created by the secret stock promotion campaign they commenced in July 2013, on August 5, 2013, the Individual Defendants caused the Company to issue a press release entitled "Reduction in Lung Fibrosis with the Anti-Galectin Drug GR-MD-02 Revealed in Preclinical Data."  Through the August 5, 2013 press release, the Individual Defendants touted the potential use of GR-MD-02 to treat idiopathic pulmonary fibrosis, described as "a chronic progressive disorder resulting in lung scarring and ultimately lung failure."  Defendant Traber is specifically quoted in the August 5, 2013 press release as stating that "[t]hese findings, taken together with others, show the broad potential of GR-MD-02 for treating organ fibrosis, which positions us to now develop partnerships with companies focused on idiopathic pulmonary fibrosis, while we continue our focus on development for the treatment of liver fibrosis."

58.     Following the now familiar pattern, the next day, August 6, 2013, Emerging Growth/TDM published another article entitled "Galectin Therapeutics Lab Studies Shows Robust Results in Treating Lung Fibrosis," authored by Klips and disseminated via *Accesswire*.[5] As with the previous articles issued by Emerging Growth/TDM, this August 6, 2013 article played up the "optimistic news" from the Company's press release issued the previous day, and specifically noted the Company's climbing stock price.

59.     On August 12, 2013, the Individual Defendants caused the Company to issue a press release entitled "Galectin Therapeutics Receives FDA Fast Track Designation for GR-MD-02 for Fatty Liver Disease with Advanced Fibrosis" which stated, in pertinent part:

---

[5]     Available at http://www.marketwatch.com/story/galectin-therapeutics-lab-studies-shows-robust-results-in-treating-lung-fibrosis-2013-08-06.

**Norcross, GA, August 12, 2013 –** Galectin Therapeutics (NASDAQ: GALT), the leading developer of therapeutics that target galectin proteins to treat fibrosis and cancer, today announced that the U.S. Food and Drug Administration (FDA) has granted GR-MD-O2 (galactoarabino-rhamnogalacturonate) Fast Track designation for non-alcoholic steatohepatitis (NASH) with hepatic fibrosis, commonly known as fatty liver disease with advanced fibrosis.

Galectin Therapeutics is currently conducting a Phase 1 clinical trial to evaluate the safety, tolerability and exploratory biomarkers for efficacy for single and multiple doses of GR-MD-02 over four weekly doses of GR-MD-02 treatment in patients with fatty liver disease with advanced fibrosis. The study will enroll 8 patients in each dose escalation cohort and there will be at least three cohorts and potentially up to 5 cohorts, with a maximum of 40 patients at six clinical sites in the US, which each have extensive experience in clinical trials in liver disease. More information on the first-in-man Phase 1 clinical study of GR-MD-02 is available at http://clinicaltrials.gov/ct2/show/NCT01899859?term=gt-020&rank=1.

"*Our preclinical data has shown that GR-MD-02 has robust treatment effects in reversing fibrosis and cirrhosis*. Fast Track designation enables us to expedite the compound's development and review process, with the ultimate goal of bringing a first-in-class treatment to the millions of Americans suffering from fatty liver disease with advanced fibrosis," said Dr. Peter G. Traber, President, Chief Executive Officer, and Chief Medical Officer of Galectin Therapeutics Inc. "We are very pleased that the FDA sees the clinical value of GR-MD-02 and seriousness of fatty liver disease, and we look forward to working closely with the FDA throughout this process."

The FDA's Fast Track program is designed to expedite the review of new drugs that are intended to treat serious or life-threatening conditions and demonstrate the potential to address unmet medical needs.

**About GR-MD-02**

GR-MD-02 is a complex carbohydrate drug that targets galectin-3, a critical protein in the pathogenesis of fatty liver disease and fibrosis. Galectin proteins play a major role in diseases that involve scaring of organs such as cancer, and inflammatory and fibrotic disorders. The drug binds to galectin proteins and disrupts their function. *Preclinical data has shown that GR-MD-02 has robust treatment effects in reversing fibrosis and cirrhosis in kidney, lung, and liver*.

60.     On August 14, 2013, the Individual Defendants caused the Company to issue a press release entitled "Galectin Therapeutics Reports Second Quarter 2013 Financial Results," touting, among other things, the Company's purported highlights for the quarter including the dosing of the first patient in July 2013 and the announcement that the FDA granted Fast Track

status for GR-MD-02 for NASH.  Defendant Traber specifically boasted how "[t]he successful first patient dosing in the clinical trial of GR-MD-02 and Fast Track designation are critical milestones in Galectin's development program and there are currently no treatments for fatty liver disease with advanced fibrosis; these milestones take us closer to bringing a first-in-class treatment to the millions of Americans suffering from this silent epidemic."

61.    That same day, on August 14, 2013, the Company filed its quarterly report for the period ended June 30, 2013.  The Form 10-Q - signed by defendants Traber and Callicutt - failed to disclose the existence of the relationship, agreement, and scheme that the Individual Defendants entered into with Emerging Growth/TDM.  Moreover, the Form 10-Q misstated the purported effectiveness of GR-MD-02 with respect to nonalcoholic steatohepatitis (NASH).  On that subject, the Individual Defendants caused the Company to represent in the Form 10-Q, in relevant part:

> *GR-MD-02.* The main initiative in our development strategy is the application of galectin inhibition in connection with liver fibrosis, a condition that leads to cirrhosis. We believe that GR-MD-02 has the potential to treat nonalcoholic steatohepatitis (NASH) and other forms of liver fibrosis. The driving factor for our commitment to galectin inhibition for fibrosis is scientific evidence that strongly suggests that galectin-3 is essential for the development of liver fibrosis in animals. Published data show that mice lacking the galectin-3 gene are incapable of developing liver fibrosis in response to toxin insult to the liver and in fatty liver disease. Moreover, mice that do not have the galectin-3 gene are resistant to lung and kidney fibrosis. Our preclinical data show that GR-MD-02 has a powerful therapeutic effect on liver fibrosis as shown in several relevant animal models. Therefore, we chose GR-MD-02 as the lead candidate in a development program targeted initially at fibrotic liver disease associated with non-alcoholic steatohepatitis (NASH, or fatty liver disease). Pre-clinical studies also show promise for the combination of GR-MD-02 with other approved immunotherapies and this additional use will be explored for possible advancement into clinical trials.
>
> In January 2013, an Investigational New Drug ("IND") was submitted to the FDA with the goal of initiating a Phase I study in patients with NASH and advanced liver fibrosis to primarily evaluate the human safety of GR-MD-02 and pharmacodynamics biomarkers of disease are also included in the trial design. On March 1, 2013, the FDA indicated we could proceed with a U.S. Phase 1 clinical trial for GR-MD-02 with a development program aimed at obtaining support for a

proposed indication of GR-MD-02 for treatment of NASH with advanced fibrosis. In February 2013 we entered into an agreement with Clinical Trial Services Inc. ("CTI") to conduct a Phase I clinical trial of GR-MD-02 to assess safety and preliminary evidence of efficacy in humans. In June 2013, we submitted a Fast Track application to the FDA to help expedite its clinical development program of GR-MD-02 in the treatment of NASH with advanced fibrosis. FDA grants Fast Track designation to help expedite review and approval of drugs in development that treat serious or life threatening diseases and fill an unmet medical need. On August 7, 2013, FDA concluded that the development program for GR-MD-02 meets the criteria for Fast Track designation, and FDA has designated the investigation of GR-MD-02 for non-alcoholic steatohepatitis with hepatic fibrosis as a Fast Track development program. We began enrolling patients in this trial in July 2013 and we expect top line of the first cohort of patients (total of 8 patients) by late 2013 or early 2014. Results of cohort 2 and cohort 3, if needed, will be available by mid-2014. In Q3 of 2014, depending on the results of the Phase I study and available funding, we may initiate a Phase II clinical trial to assess the efficacy of GR-MD-02 in patients with NASH and advanced liver fibrosis and based on that timing we would expect top-line clinical results by late 2015 or early 2016, depending on the final design of the phase 2 study.

62.     Emerging Growth/TDM again quickly followed with an "article" touting Galectin, published on August 14, 2013 and written by Klips, entitled "Galectin Therapeutics Receives Fast Track Designation from FDA for New Fibrosis Drug."[6]  The "article" stated, in relevant part:

Shares of Galectin Therapeutics (NASDAQ: GALT) hit their highest level since June 2011 in the last two trading sessions after announcing that the U.S. Food and Drug Administration granted the company a Fast Track designation for GR-MD-02 as a potential new drug for non-alcoholic steatohepatitis, or "NASH" as its often called. *Shares of Galectin have been steadily rising in 2013, advancing about 240 percent, upon pipeline developments as the drugmaker emerges as a leader in fibrosis and cancer therapies*.

*With no FDA-approved drugs available for fibrosis, the upside potential is large, to say the least*, with only limited companies, including Vertex Pharmaceuticals Inc. (NASDAQ: VRTX) and InterMune Pharmaceuticals Inc. (NASDAQ: ITMN) looking to blaze new trails in fibrosis along with Galectin. It is estimated that NASH affects as many as 15 million people in the United States, generally carrying a very grim prognosis in advanced stages. The Fast Track designation is designed to expedite the review process in new drugs that could potential provide a therapeutic option for serious or life-threatening conditions that represent an area of unmet medical need. As part of the Fast Track plan, the

---

[6]  Article available at
http://secfilings.com/News.aspx?title=galectin_therapeutics_receives_fast_track_designation_from_fda_for_new_fibrosis_drug&naid=507.

biotech is able to submit data to FDA as it is compiled and opens the door to more meetings with regulators.

Late in July, Galectin disclosed that the first patients were dosed with GR-MD-02 in a Phase I clinical trial evaluating the effect of the new drug in patients with fatty liver disease with advanced fibrosis. A maximum of 40 patients will be treated across six U.S. centers in the trial.

**The Individual Defendants Take Advantage of Galectin's Bloated Stock Price**

63.     On August 21, 2013, the Individual Defendants caused the Company to announce that it had completed a $3 million private placement of 500,000 shares of unregistered common stock "to a single investor" for $6 per share which, according to the press release, represented a 10% discount from the 15 day weighted average trading price of the stock.  Then, just a week later on August 28, 2013, the Individual Defendants caused the Company to announce that 710,834 common stock purchase warrants (which were otherwise set to expire on August 25, 2013 if not exercised before then) had been exercised for total cash proceeds of an additional $3 million to the Company.

64.     By October 1, 2013, the Individual Defendants' scheme had begun to bear fruit, with Galectin stock then trading at over $10 per share.  As such, the Insider Selling Defendants could now begin to cash in on the secret stock promotion scheme, either personally or by way of entities they owned and/or controlled.

65.     On or about October 7, 2013, while in possession of material, adverse, non-public information, defendants Czirr and Martin caused the 10X Fund to sell 100,000 shares of its Galectin stock at a price of $11.79 per share, reaping proceeds totaling $1.179 million.  The following day, while in possession of material, adverse, non-public information, defendants Czirr and Martin caused the 10X Fund to sell an additional 12,000 shares of its Galectin stock at a price of $12.36 per share, reaping additional proceeds of $148,320 (for a two day total of $1,327,320).

66.    On October 14, 2013, Emerging Growth/TDM continued the secret stock promotion campaign by releasing an "article" authored by Fred Zucker ("Zucker") via *Accesswire* entitled "Galectin Stands Out in 2013 with Liver Fibrosis Drug,"[7] stating in pertinent part:

Biotechnology has been an outperforming sector in 2013 with IBB, iShares Nasdaq Biotechnology Index Fund, rising about 57 percent through September 27 highs. BIB, the ProShares Ultra Nasdaq Biotechnology Index has roared ahead about 135 percent through highs on the same day.

While those gains are certainly robust, the September high of Galectin Therapeutics Inc. (NASDAQ: GALT) at $13.21 made them seem paltry, producing gains of more than 550 percent in 2013 for GALT shareholders. ***The surge in Galectin's valuation seems simply a product of corporate advancements as the company establishes itself as a leader in pioneering treatments for fibrosis, especially liver fibrosis that results from fatty liver disease.***

Liver fibrosis can be an asymptomatic death sentence with no available therapeutics to treat the scarring in the liver that leads to liver complications, co-morbidities and death. The genesis of fibrosis is fatty liver disease, with the combined conditions, called non-alcoholic steatohepatitis, or "NASH," affecting as many as 15 million Americans today. Some estimates put the number of Americans affected by nonalcoholic fatty liver disease (NAFLD) as high as 30 percent of the population, or approximately 94 million people.

With the high diagnosis rate, researchers have mostly focused on developing therapies to stop the accumulation of fat in the liver, but with limited success. Companies devoting their resources toward new treatments for advanced stages of the diseases are minimal, with Galectin and Gilead Sciences (NASDAQ: GILD) running promising programs in that space. Meanwhile, the select few other companies targeting fibrosis are focused on the early stages of the disease, a time where it can be very difficult to identify which patients will advance to more serious stages of the disease. Gilead has received plenty of attention in 2013 for its leadership role in HIV drugs as well as fibrosis efforts with simtuzumab in mid-stage trials for NASH patients, helping send shares about 70 percent higher so far this year.

While Galectin has its GM-CT-01 drug candidate in Phase 2 clinical trials for melanoma, ***perhaps an even larger driver has been their research of their galectin protein-inhibiting drugs that shows the potential for GR-MD-02 to not only treat NASH patients, but also actually reverse the scarring in the liver. A drug to treat fatty liver disease and fibrosis has blockbuster potential written all***

---

[7]    Available at http://www.marketwatch.com/story/galectin-stands-out-in-2013-with-liver-fibrosis-drug-2013-10-14.

21

*over it, but one that can actually reverse scarring can revolutionize fibrosis research.*

While this article is only referencing the liver, fibrosis is prominent in other vital organs as a result of inflammation or damage, such as the lungs, heart, intestines and more. *Galectin has conducted pre-clinical research on GR-MD-02 to expand into additional indications, with information released in September disclosing the drug showing a "robust effect" in reducing lung fibrosis.* Separate research has also demonstrated tumor shrinkage and enhanced survival in immune competent breast and prostate cancer mouse models treated with GR-MD-02 in combination with immune checkpoint blockage inhibitors anti-CTLA-4 or anti-PD-1.

Galectin is evaluating GR-MD-02 in the Phase 1 trial under a Fast Track designation from the Food and Drug Administration with the first patient dosed in July. The trial is planned to enroll about 32 patients with NASH and stage 3 fibrosis across six clinical sites in the U.S.

There's no doubt that the biotech sector has been one of the best market performers in 2013 and it doesn't look to be losing any steam. Even as some of the majors take a breather as the new year approaches, investors should be looking for developmental companies that are starting to grow a stronger valuation based upon two things: the data supporting their drug and the future market potential if successfully maneuvered down the regulatory pathway. *In the case of companies engaged in fibrosis treatments, market capitalizations in the low hundreds of millions of dollars should only represent a portion of the things to come.*

67.     On October 17, 2013, with the price of Galectin common stock trading at over $11 per share, the Company disclosed that the 10X Fund, which was and is controlled by defendants Czirr and Martin, exercised 300,000 common stock purchase warrants of Galectin for just $3 per share for total cash proceeds to Galectin of $900,000.  The warrants were not set to expire until February 12, 2014.

68.     Then, on October 25, 2013, the Individual Defendants caused the Company to enter into an At Market Issuance Sales Agreement (the "ATM Offering")[8] with MLV & Co. LLC under which the Company could issue and sell shares of its common stock having an aggregate

---

[8]  An ATM Offering is a type of follow-on offering of stock that allows a publicly traded company to raise capital over time.  A higher stock price means a greater amount of money can be raised.  http://en.wikipedia.org/wiki/At-the-market_offering.

offering price of up to $30 million.  The Individual Defendants caused the Company to file a prospectus supplement that same day.

69.     Thereafter, on November 4, 2013 – just 10 days after the announcement of the ATM Offering, another "article" was published by Emerging Growth/TDM, this one authored by Ryan Allway, entitled "Pharmaceutical Stocks Outperform the S&P 500 by 20% YTD,"[9] which touted Galectin stock, stating in pertinent part:

**Big Pharma Versus Smaller Equities**

Big pharmaceutical companies, like Pfizer Inc. (NYSE: PFE) or Merck & Co. (NYSE: MRK), may account for the majority of the major pharmaceutical ETFs. But many investors are concerned that these large companies may be overvalued after their rally. For example, Pfizer trades with a price-earnings ratio of 20.2x, which is higher than the industry average of 16.8x, the S&P 500 average of 17x, and even its own 5-year average of 17.2x, which is perhaps the most relevant.

Investors may therefore want to take a look at some smaller equities in the space, i**ncluding those that are valued on their future potential rather than current earnings. For example, Galectin Therapeutics Inc. (NASDAQ: GALT) has surged more than 400% so far this year**, based on study results showing that tumor cells secrete galectin-3 (its target), which binds to, and blocks the action of, tumor-infiltrating T-lymphocytes, the body's major immune defense.

***While GM-CT-01 is in Phase I/II proof-of-concept clinical trials to treat melanoma, GR-MD-02 has the potential to treat non-alcoholic steatohepatitis (NASH, part of the fatty liver disease/fibrosis/cirrhosis progression) patients and even reverse scarring in the liver. The reduction in scarring for the liver – and other organs in preclinical trials – could revolutionize fibrosis research and produce a blockbuster drug, if approved***. Currently, GR-MD-02 is in Phase I clinical trials under a Fast Track designation from the FDA with the first patient dosed in July.

70.     On November 12, 2013, the Individual Defendants caused the Company to issue a press release entitled "Galectin Therapeutics Reports Update on Enrollment of First Cohort of Phase 1 Clinical Trial and Third Quarter 2013 Financial Results," noting, among other things, that the Company completed enrollment of the first five of eight patients for its Phase 1 clinical

---

[9]  Article available at http://secfilings.com/News.aspx?title=pharmaceutical_stocks_outperform_the_s&p_500_by_20%_ytd&naid=580.

trial for patients with NASH with advanced fibrosis.  This press release also noted that "the patients enrolled have not incurred any serious adverse events."

71.     The November 12, 2013 press release also disclosed that on November 1, 2013, the 10X Fund exercised another 200,000 Galectin stock purchase warrants at $3.00 per share, for another $600,000 in proceeds to the Company.  Galectin stock closed at $9.14 per share on November 1, 2013.  Finally, the press release provided an update on the ATM Offering, stating that since September 30, 2013, the Company received $500,000 in net proceeds from the issuance of 50,653 shares through the ATM Offering at an average price per share of $10.82.

72.     That same day, on November 12, 2013, the Company filed its quarterly report for the period ended September 30, 2013.  The Form 10-Q was signed by defendants Traber and Callicutt and failed to disclose the existence of the relationship, agreement, and scheme that the Individual Defendants entered into with Emerging Growth/TDM.  Moreover, the Form 10-Q misstated the purported effectiveness of GR-MD-02 with respect to nonalcoholic steatohepatitis (NASH).  On that subject, the Form 10-Q represented, in relevant part:

> *GR-MD-02.* The main initiative in our development strategy is the application of galectin inhibition in connection with liver fibrosis, a condition that leads to cirrhosis. We believe that GR-MD-02 has the potential to treat nonalcoholic steatohepatitis (NASH) and other forms of liver fibrosis. The driving factor for our commitment to galectin inhibition for fibrosis is scientific evidence that strongly suggests that galectin-3 is essential for the development of liver fibrosis in animals. Published data show that mice lacking the galectin-3 gene are incapable of developing liver fibrosis in response to toxin insult to the liver and in fatty liver disease. Moreover, mice that do not have the galectin-3 gene are resistant to lung and kidney fibrosis. Our preclinical data show that GR-MD-02 has a powerful therapeutic effect on liver fibrosis as shown in several relevant animal models. Therefore, we chose GR-MD-02 as the lead candidate in a development program targeted initially at fibrotic liver disease associated with non-alcoholic steatohepatitis (NASH, or fatty liver disease). Pre-clinical studies also show promise for the combination of GR-MD-02 with other approved immunotherapies and this additional use will be explored for possible advancement into clinical trials. In this regard, a phase I clinical trial is in the design phase for immunotherapy for metastatic melanoma with a combination of Yervoy (ipilimumab, BMS) and GR-MD-02 which will be conducted at Providence Portland Medical Center in Portland Oregon.

24

In January 2013, an Investigational New Drug ("IND") was submitted to the FDA with the goal of initiating a Phase I study in patients with NASH and advanced liver fibrosis to primarily evaluate the human safety of GR-MD-02 and pharmacodynamics biomarkers of disease are also included in the trial design. On March 1, 2013, the FDA indicated we could proceed with a U.S. Phase 1 clinical trial for GR-MD-02 with a development program aimed at obtaining support for a proposed indication of GR-MD-02 for treatment of NASH with advanced fibrosis. In February 2013 we entered into an agreement with Clinical Trial Services Inc. ("CTI") to conduct a Phase I clinical trial of GR-MD-02 to assess safety and preliminary evidence of efficacy in humans. In June 2013, we submitted a Fast Track application to the FDA to help expedite its clinical development program of GR-MD-02 in the treatment of NASH with advanced fibrosis. FDA grants Fast Track designation to help expedite review and approval of drugs in development that treat serious or life threatening diseases and fill an unmet medical need. On August 7, 2013, FDA concluded that the development program for GR-MD-02 meets the criteria for Fast Track designation, and FDA has designated the investigation of GR-MD-02 for non-alcoholic steatohepatitis with hepatic fibrosis as a Fast Track development program. We began enrolling patients in this trial in July 2013 and we expect top line of the first cohort of patients (total of 8 patients) in early 2014. Results of cohort 2 and cohort 3, if needed, are expected be available by mid-2014. In late 2014 or early 2015, depending on the results of the Phase I study and available funding, we may initiate a Phase II clinical trial to assess the efficacy of GR-MD-02 in patients with NASH and advanced liver fibrosis and based on that timing we would expect top-line clinical results in the first half of 2016, depending on the final design of the phase 2 study.

73.    The following month, on December 20, 2013, Emerging Growth/TDM issued another "article" via *Accesswire*, this one authored by Zucker.  The December 20, 2013 "article," entitled "Obesity Stock Plays Standing Out from the Crowd,"[10] again touted Galectin's potential, stating in pertinent part:

Galectin Therapeutics (NASDAQ: GALT) is focused on developing new drugs for fibrosis and cancer through its carbohydrate technology targeting galectin proteins, which are known to be key mediators of biologic and pathologic function. While, as mentioned above, cancer is linked to obesity, for this purpose the focus will be on fibrosis, or scarring of organs, *an area where Galectin faces very limited competition in an area of great unmet medical need*.

It's important to understand that heart disease can be treated and that even the most dreaded form of cancer can be eradicated from the body, but once an organ is scarred, there is little to nothing that can be done, short of a transplant. Led by CEO Dr. Peter Traber, the former Chief Medical Officer at GlaxoSmithKline (NYSE: GSK), Galectin is aiming to inhibit the galectin-3 protein with its drug

---

[10]    Available at http://www.marketwatch.com/story/obesity-stock-plays-standing-out-from-the-crowd-2013-12-20.

GR-MD-02 to treat scarring of the liver, with possible expansion to other vital organs, such as the lungs or kidneys.

The company has received a Fast Track designation from the FDA for GR-MD-02, a novel drug candidate that commenced clinical trials in July for the treatment of patients with nonalcoholic steatohepatis (NASH) with advanced hepatic fibrosis. Five of eight patients in the first cohort have been infused with GR-MD-02 to date with no serious adverse events reported. The small handful of companies addressing NASH, including Gilead Sciences (NASDAQ: GILD), are targeting the disease at a very early stage when there is a build-up of fat and inflammation in the liver, but it is still impossible to discern which patients will progress to advanced stages of NASH or cirrhosis. *Galectin is tackling the latter stage of the disease based upon preclinical research that showed GR-MD-02 could not only reduce inflammation, but reverse the fibrotic condition and cirrhosis, a therapeutic benefit that could complete reshape the current landscape of fibrosis care*.

Sign up to receive updates on Galectin Therapeutics here: **http://www.tdmfinancial.com/emailassets/galt/galt_landing.php**

*Investors will be attentive to Galectin disclosing some data from the first-in-man study of its kind early in 2014. Given its uniqueness, GR-MD-02 could also be a candidate for other FDA programs to further expedite its development, designations that have proven fruitful to accelerate the regulatory pathway for Gilead's hepatitis C drug Sovaldi*.

74.     On January 6, 2014, the Individual Defendants caused Galectin to issue a press release entitled "Galectin Therapeutics Receives US Patent for Combination Treatment for Liver Fibrosis." The January 6, 2014 press release stated in pertinent part:

Galectin Therapeutics, the leading developer of therapeutics that target galectin proteins to treat fibrosis and cancer, today announced that it has received a notice of allowance from the U.S. Patent and Trademark Office for patent application number 13/550,962 titled "Galactose-Pronged Polysaccharides in a Formulation for Antifibrotic Therapies." The patent covers both composition claim for and uses of the Company's carbohydrate-based galectin inhibitor compound GR-MD-02 for use in patients with liver fibrosis in combination with other potential therapeutic agents. The patent covers use of GR-MD-02 with agents directed at multiple targets, some of which are currently in clinical development for fibrotic disorders including monoclonal antibodies to connective tissue growth factor, integrins, and TGF-β1.

"This patent provides additional coverage in the U.S. for the use of GR-MD-02 in combination with other potential anti-fibrotic agents in the treatment of liver fibrosis," said Peter G. Traber, MD, President, CEO and CMO of Galectin Therapeutics. "In the future, liver fibrosis could be treated with a combination of agents, and this patent provides important intellectual property for this possibility.

We are hopeful that our development program for GR-MD-02 will lead to the first therapy for the large unmet medical need of liver fibrosis."

Galectin Therapeutics is currently conducting a Phase 1 clinical trial to evaluate the safety, tolerability and exploratory biomarkers for efficacy for single and multiple doses of GR-MD-02 over four weekly doses of GR-MD-02 treatment in patients with fatty liver disease with advanced fibrosis. In March 2013, the U.S. Food and Drug Administration (FDA) granted GR-MD-02 Fast Track designation for nonalcoholic steatohepatitis (NASH) with hepatic fibrosis, commonly known as fatty liver disease with advanced fibrosis.

75.     Immediately thereafter, on January 7, 2014, Emerging Growth/TDM followed-up with another enthusiastic "article" authored by Zucker and issued via *Accesswire*, entitled "Galectin Therapeutics Receives Patent for Combination Treatment for Liver Fibrosis,"[11] stating in relevant part:

> *Galectin Therapeutics (NASDAQ: GALT), the leading developer of therapeutics that target galectin proteins to treat fibrosis and cancer, recently sent waves through the biotechnology investment community* after it published a preclinical study showing the therapeutic effects of galectin inhibitors in fatty liver disease with fibrosis. *Results revealed that treatment with GR-MD-02 significantly improved NASH activity and reduced fibrosis including prevention of accumulation of collagen and/or reduced accumulated collagen in the liver. With no approved treatments for fatty liver disease with fibrosis, the breakthrough is very important for investors*.
>
> This week, the company announced that it received a notice of allowance from the U.S. Patent and Trademark Office for patent application number 13/550,962 titled "Galactose-Pronged Polysaccharides in a Formulation for Anti-fibrotic Therapies." The patent covers the use of its carbohydrate-based galectin inhibitor compound for patients with liver fibrosis in combination with other potential therapeutic agents to enhance overall efficacy.
>
> *Investors in Gilead Sciences Inc. (NASDAQ: GILD) and Biogen Idec Inc. (NASDAQ: BIIB) may want to take a closer look at Galectin Therapeutics given these developments as both are developing drugs that may be affected by this patent*.

76.     Then, on January 8, 2014, the Individual Defendants caused the Company to issue a press release entitled "Galectin Therapeutics Reports on Key 2013 Scientific, Development and

---

[11]     Available at http://www.marketwatch.com/story/galectin-therapeutics-receives-patent-for-combination-treatment-for-liver-fibrosis-2014-01-07.

Regulatory Milestones, Highlights Corporate and Financial Activity" further touting the Company's purported 2013 accomplishments.

77.    From January 8, 2014 through and including January 10, 2014, following the Company's January 6 and 8, 2014 press releases and the January 7, 2014 Emerging Growth/TDM "article," Galectin's stock **nearly doubled**, skyrocketing from $8.47 per share to $15.10 per share on heavy volume.

78.    On January 10, 2014, the Individual Defendants provided an update regarding the ATM Offering via a Company press release disclosing that, through the ATM Offering, from October 28, 2013 through January 9, 2014, the Company sold a total of 2,391,204 shares of common stock for gross proceeds of $23,883,137 at an average price of $9.99 per share.

79.    With the success of their secret stock promotion campaign reaching a crescendo, it was time, once again, for the Insider Selling Defendants to cash in.

80.    Specifically, on or about January 10, 2014, while in possession of material, adverse, non-public information, defendants Czirr and Martin caused the 10X Fund to sell another 42,000 shares of its Galectin stock at $16 per share, reaping proceeds of $672,000. Then, on or about January 13, 2014, while in possession of material, adverse, non-public information, defendants Czirr and Martin caused the 10X Fund to sell an additional 58,000 shares of its Galectin stock for $14 per share, reaping additional proceeds of $812,000. Finally, on January 31, 2014, while in possession of material, adverse, non-public information, defendant Prelack – the Chairperson of the Audit Committee - took advantage of the artificially inflated price of Galectin stock by disposing of 17,772 shares of Galectin stock at $13.71 per share, reaping proceeds totaling $242,968.[12]

---

[12]   According to the Form 4 filed with the SEC on February 4, 2014, this transaction represented shares forfeited in satisfaction of the exercise price of the vested options. Had Galectin stock not been trading at artificially inflated prices (due to the Individual Defendants' secret stock

81.     On January 13, 2014, the Individual Defendants caused the Company to issue a press release entitled "Galectin Therapeutics Announces Completion of Enrollment in First Cohort of Phase 1 Trial of GR-MD-02 in Fatty Liver Disease with Advanced Fibrosis" announcing that patient enrollment in the first cohort of the Phase 1 GR-MD-02 was complete. In the January 13, 2014 press release, defendant Traber claimed that "[c]ompletion of enrollment in the first cohort is an important step toward Galectin Therapeutics' objective of bringing a first-in-class treatment to the millions of Americans suffering from fatty liver disease with advanced fibrosis" and that "[t]o date, we have seen no serious adverse events in the trial. Following the 70 day study period and analysis of the data, we anticipate that initial safety and tolerability results, as well as biomarkers to evaluate for potential disease effect, from the first cohort will be available around the end of the first quarter of this year."

82.     Just two days later, on January 15, 2014, the Individual Defendants caused the Company to issue yet another press release, entitled "Galectin Therapeutics Supports Investigational New Drug (IND) Application for its Galectin Inhibitor GR-MD-02 in Metastatic Melanoma" stating, in pertinent part:

**Norcross, GA (January 15, 2014) – Galectin Therapeutics Inc. (NASDAQ: GALT)**, the leading developer of therapeutics that target galectin proteins to treat fibrosis and cancer, today announced that Providence Portland Medical Center filed an Investigational New Drug (IND) application with the U.S. Food and Drug Administration (FDA) on December 27, 2013 to study GR-MD-02 in combination with Yervoy® (ipilimumab) in a Phase 1B study of patients with metastatic melanoma. GR-MD-02 is Galectin Therapeutics' proprietary molecule that binds to and inhibits galectin proteins, predominantly galectin-3.

The application was prompted by findings from a preclinical study led by tumor immunology expert William L. Redmond, Ph.D., of the Providence Portland Medical Center's Earle A. Chiles Research Institute (EACRI). The preclinical study found that GR-MD-02 increased tumor shrinkage and enhanced survival in immune competent mice with prostate and breast cancers when combined with

_____

promotion scheme), defendant Prelack would have been required to forfeit far more than 17,772 shares of Company stock.

one of the immune checkpoint inhibitors, anti-CTLA-4 or anti-PD-1. These findings suggest a role for GR-MD-02 in cancer immunotherapy.

"The IND filing to study GR-MD-02 in conjunctive use with Yervoy in patients with metastatic melanoma is an important milestone for both Providence Portland Medical Center and Galectin Therapeutics," said Dr. Peter G. Traber, President, Chief Executive Officer and Chief Medical Officer, Galectin Therapeutics. "Preclinical data have shown that GR-MD-02 holds immense potential for increasing the effectiveness of other therapies and may be an important approach in enhancing cancer immunotherapy."

If the application is approved by the FDA, the Phase 1B study will be conducted by the EACRI under principal investigator Brendan D. Curti, M.D. EACRI and Providence Cancer Center researchers have been leaders in immunotherapy research and translational clinical trials in melanoma and other cancers.

"The Phase 1B study will determine if GR-MD-02 enhances the probability of melanoma response with ipilimumab by inducing proliferation, activation and memory function of CD8+ T cells," said Dr. Curti, the trial's principal investigator, a medical oncologist and director of the Providence Biotherapy Program at EACRI. "The combination of GR-MD-02 and ipilimumab has a strong scientific rationale based on Dr. Redmond's laboratory work. This study represents a novel approach for patients with metastatic melanoma."

The study will employ a 3+3 Phase 1 design with dose escalation of GR-MD-02 in conjunction with the standard therapeutic dose of ipilimumab in patients with advanced melanoma for whom ipilimumab would be considered standard of care. In addition to monitoring for toxicity and clinical response, blood samples will be obtained to assess immunologic measures relevant to galectin biology and ipilimumab T-cell check-point inhibition. Galectin Therapeutics will provide its proprietary compound GR-MD-02 to EACRI researchers, as well as supply researchers with supporting analysis of the pharmacokinetics of GR-MD-02 and the right to reference the Company's open IND on GR-MD-02.

83.     Also, in the January 15, 2014 press release, the Individual Defendants acknowledged in passing that Galectin's only other drug candidate, GM-CT-01, had been "placed on hold," stating:

Separately, the Cancer Centre at the Cliniques universitaires Saint-Luc and the Ludwig Institute for Cancer Research (LICR), in agreement with Galectin Therapeutics, **placed on hold its Phase 1/2 trial evaluating the safety and efficacy of another galectin inhibitor, GM-CT-01**, in combination with an experimental peptide vaccine for the treatment of advanced metastatic melanoma. Dr. Jean-Francois Baurain, the trial's principal investigator, medical oncologist and director of the melanoma clinic of the Cancer Center at CUSL, said, "The trial was unable to enroll sufficient patients with advanced stage melanoma due to the high selection criteria of patient candidates for the peptide vaccine and the

30

recent availability of Yervoy in Europe as a treatment increasing the overall survival of metastatic melanoma patients." A total of three patients completed the trial with no serious adverse events attributed to drug treatment and with two patients having a mixed response and one having progressive disease.

84.     On January 21, 2014, the Individual Defendants caused the Company to issue a press release entitled "Preclinical Study Demonstrates Effect of Galectin Inhibitor on Serum Biomarker in Fatty Liver Disease with Fibrosis," further touting GR-MD-02's potential.  This time, the Individual Defendants' announcement highlighted data from a preclinical study purportedly showing that GR-MD-02 significantly reduced hyaluronic acid, "a well investigated marker of liver fibrosis," by approximately 33% when untreated animals were compared with those treated with GR-MD-02.  Defendant Traber enthusiastically represented that "these results in this preclinical model of NASH show that improvement in NASH and fibrosis with GR-MD-02 treatment appear to correlate with plasma levels of hyaluronic acid, a biomarker that has been shown in multiple human studies to correlate with liver fibrosis," and noted that "[w]e are examining the levels of hyaluronic acid as well as multiple other markers of inflammation, cell death and fibrosis in our current Phase 1 clinical trial of GR-MD-02 in NASH patients with advanced fibrosis."

85.     On January 27, 2014, the Individual Defendants caused the Company to issue a press release announcing Galectin had established and formed Galectin Sciences, LLC ("Galectin Sciences") with SBH Sciences, Inc., a company located in Natick, Massachusetts, which describes itself as a world leader in cell-based assays to measure biological activity and developer of cytokines, growth factors, biologics and monoclonal antibodies.  According to the January 27, 2014 press release, Galectin Sciences "will build on the scientific body of knowledge amassed by SBH Sciences, coupled with Galectin Therapeutics' knowledge and expertise of galectins' pathological role and mechanism of action in inflammation, fibrosis and many cancers" and defendant Traber touted the formation of Galectin Sciences as representing "a

31

significant step forward in the research of galectin proteins and demonstrates both companies' confidence in galectin inhibitors as potential treatment options for diseases with large unmet medical need."

86.     Then, just a few days later, the Individual Defendants continued to perpetuate the seemingly non-stop parade of positive news associated with GR-MD-02, causing the Company to issue a press release on February 3, 2014 announcing that the FDA "agreed that a Phase 1B clinical trial of the galectin inhibitor GR-MD-02 in combination with Yervoy® (ipilimumab) in patients with metastatic melanoma may proceed."   Defendant Traber specifically touted this development as "a critical step in seeking a new treatment option for metastatic melanoma."

87.     Emerging Growth/TDM issued another glowing "article" via *Accesswire* on February 13, 2014, again praising Galectin, authored by Zucker and entitled "Galectin Therapeutics Leaps Ahead with SBH Sciences Partnership."[13]   This "article" unabashedly bragged about the likely positive impact the SBH Sciences joint venture would have on Galectin, touted the "ideal strategic fit" between the two companies, opined that Galectin could be an acquisition target, and noted that Galectin's clinical advancements over the previous year resulted in significant share appreciation.   The "article" even quoted defendant Traber regarding the joint venture.   Specifically, the "article" stated, in pertinent part:

> A growing body of research on galectins is demonstrating the important role that this family of carbohydrate-binding proteins plays in T-cell survival, fibrosis of organs, allergies, deadly diseases like cancer, regulation of many immune responses and much more.   Only defined about two decades ago, 15 different mammalian galectins have now been identified, with overexpression of specific galectins implicated in a variety of diseases.   The potential of this emerging science is tremendous, to say the least, to help bridge gaps in a broad range of deadly or debilitating disorders with great unmet medical need.
>
> ***Galectin Therapeutics Inc. (NASDAQ:GALT), a pioneer in research and development of galectin-inhibiting compounds, scored a big win for their company and the industry*** in January by forging a new alliance with SBH

---

[13]   Available at http://www.marketwatch.com/story/galectin-therapeutics-leaps-ahead-with-sbh-sciences-partnership-2014-02-13.

Sciences.  The companies established Galectin Sciences, LLC, a joint venture that will initially focus on developing small organic molecule inhibitors of galectin-3 for oral administration.

***The two companies are an ideal strategic fit.  Galectin Therapeutics has a promising pipeline of drug candidates, with GR-MD-02 in a phase 1 clinical trial for treatment of nonalcoholic steatohepatitis (NASH) with advanced fibrosis.  GR-MD-02 was also was recently approved by the FDA to proceed with a phase 1b clinical trial in combination with Bristol-Myers Squibb's (NYSE:BMY) Yervoy to treat metastatic melanoma patients.***

As a Contract Research Organization, SBH Sciences is primarily a services company, providing products and services to more than 120 clients worldwide, mostly in the areas of oncology and inflammation.  Using its expertise in computer molecular modeling and in vitro screening, SBH is becoming more involved with its own drug development programs, rather than just shepherding other companies into clinical trials.  According to **the press release** announcing the partnership, SBH has already identified several small molecules that act to inhibit galectin-3 that are worthy of more extensive research.

Forming Galectin Sciences, rather than SBH contracting Galectin Therapeutics or vice-versa, is a succinct move that incentivizes both companies because now they each have skin in the game.  Galectin Therapeutics gains access to promising new drug candidates while mitigating R&D expenses and SBH gets Galectin Therapeutics' decades of experience and knowledge in galectin proteins.

***Galectin Sciences was assembled to focus its resources on the development of new oral drugs targeting galectins, which will serve a great complement to the drugs already in clinical trials by GALT***.  GR-MD-02 and GM-CT-01 are designed for intravenous administration and work very well for fatal diseases like liver fibrosis and cancer that can be treated with a weekly dosing regimen.  Every disease has a target product profile and while IV administration will provide the best results in some indications, oral delivery can be more appropriate for others, such as chronic diseases and conditions.  ***These diseases where a pill is best served will be the initial targets for the new JV.  With diversified delivery systems, GALT is well positioned to develop a broad range of galectin inhibitors that match target product profiles***.

Pills are generally the drug delivery method of choice by patients and physicians regarding chronic conditions simply because of convenience, which often improves quality of life and compliance.  From a payer perspective, oral medications are often favorable because they are less expensive.  Consider why Gilead Sciences (NYSE:GILD) was willing to dish-out $11 billion to acquire Pharmasset in 2011.  The main driver was Pharmasset's PSI-7977, an all-oral hepatitis C therapy that was pegged by many as the replacement for injections of interferon, the standard of care for the disease.

33

*We reached out to Dr. Peter Traber, president, CEO and CMO at Galectin Therapeutics, who explained that the sights are set for Galectin Sciences to explore new target indications where oral therapies are the most viable and favorable. This includes chronic conditions such as allergies, eczema, arthritis and atherosclerosis. "Blockbuster drugs like Pfizer's (NYSE:PFE) Lipitor likely would never have achieved the incredible success that they have if they didn't come in pill form," Traber said in a phone conversation. In addition to the promising compounds already identified, Traber believes that SBH Sciences' proficiency in assays and compound-screening technologies will play a key role in new drug discoveries in the future.*

*It is evident that this bolt-on drug discovery machine that Traber describes could allow Galectin Therapeutics to maintain its leadership position in the galectin space for years to come. It is also arguable that the new portfolio company will make Galectin Therapeutics more attractive as a partner or acquisition target in the future. The clinical advancements of GR-MD-02 and GM-CT-01 in the past year have resulted in significant share appreciation for GALT. Rightfully so, these flagship programs are clearly the backdrop of the company and measuring stick for its market valuation. Going forward, though, Wall Street should start to factor-in the new Galectin Sciences asset as it builds and discloses the products in its pipeline, which could add significant value if comparable to the drugs candidates that Galectin Therapeutics has already taken into the clinic.*

88.     On March 21, 2014, the Individual Defendants caused the Company to file with the SEC its 2013 10-K, which was signed by each of the Individual Defendants. Like past Company SEC filings made during the Relevant Period up to this point, the 2013 10-K failed to disclose the existence of the secret relationship, agreement, and scheme that the Individual Defendants entered into with Emerging Growth/TDM.

89.     Moreover, in the 2013 10-K, the Individual Defendants again misstated the purported effectiveness of GR-MD-02 with respect to nonalcoholic steatohepatitis (NASH). On that subject, the 2013 10-K set forth, in relevant part:

*Fibrosis.* GR-MD-02 is our lead product candidate for treatment of fibrotic disease. Our preclinical data show that GR-MD-02 has a powerful therapeutic effect on liver fibrosis as shown in several relevant animal models. Therefore, we chose GR-MD-02 as the lead candidate in a development program targeted initially at fibrotic liver disease associated with non-alcoholic steatohepatitis (NASH, or fatty liver disease). In January 2013, an Investigational New Drug ("IND") was submitted to the FDA with the goal of initiating a Phase 1 study in patients with NASH and advanced liver fibrosis to evaluate the human safety of

34

GR-MD-02 and pharmacodynamics biomarkers of disease. On March 1, 2013, the FDA indicated we could proceed with a US Phase 1 clinical trial for GR-MD-02 with a development program aimed at obtaining support for a proposed indication of GR-MD-02 for treatment of NASH with advanced fibrosis. Pre-clinical studies also show promise for the combination of GR-MD-02 with other approved immunotherapies and this additional use has been advanced into clinical trials under an Investigator-sponsored IN/D in the United States.

Our drug candidate provides a promising new approach for the therapy of fibrotic diseases, and liver fibrosis in particular. Fibrosis is the formation of excess connective tissue (collagen and other proteins plus cellular elements such as myofibroblasts) in response to damage, inflammation or repair. When the fibrotic tissue becomes confluent, it obliterates the cellular architecture, leading to scarring and dysfunction of the underlying organ.

90.    In addition, pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), the 2013 10-K

included signed certifications ("SOX Certifications") by defendants Traber and Callicutt,

through which Traber and Callicutt attested that all of the financial information contained in the

2013 10-K was accurate, and that any material changes to the Company's internal controls over

financial reporting were disclosed.  Specifically, the SOX Certifications set forth:

I, [Peter G. Traber/Jack W. Callicutt], certify that:

1. I have reviewed this annual report on Form 10-K of Galectin Therapeutics Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and we have:

  a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

*        *        *

In connection with the Annual Report of Galectin Therapeutics Inc. (the "Company") on Form 10-K for the period ended December 31, 2013 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, [Peter G. Traber, Chief Executive Officer and President of the Company/ Jack W. Callicutt, Chief Financial Officer of the Company], certify, pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

91.     The 2013 10-K did provide an update as to the success of the Company's ATM Offering.   According to the 2013 10-K, as of December 31, 2013, the Company issued 99,942 shares of its common stock *for gross proceeds of $944,000 – or an average price of $9.44 per share*, and in January and February 2014, the Company issued another 2,663,647 shares of common stock *for gross proceeds of approximately $29,051,000 – or an average price of $10.90 per share*.

92.     Also on March 21, 2014, the Individual Defendants caused the Company to file with the SEC and disseminate to shareholders a Proxy Statement pursuant to Section 14(a) of the Exchange Act on Form DEF 14A (the "2014 Proxy"), in which the Individual Defendants solicited shareholder votes in connection with the following matters:

- To elect the nine (9) directors named in [the] proxy statement to serve for one-year terms, expiring at [the Company's] 2015 annual meeting of stockholders.

- To approve an amendment to the 2009 Incentive Compensation Plan to reserve an additional 1,400,000 shares for issuance under the plan.

- To ratify the selection by the Audit Committee of the Board of Directors of McGladrey LLP as [the Company's] independent registered public accounting firm for the fiscal year ending December 31, 2014.

93.     The 2014 Proxy described Board members' responsibilities, the duties of each Board subcommittee, Board risk management, and information about the nominees for election to the Board, as well as senior executive officers.  The 2014 Proxy also specifically stated:

We believe that good corporate governance is important to ensure that Galectin Therapeutics is managed for the long-term benefit of our stockholders. *Our board of directors is responsible for establishing our corporate policies* and overseeing the management of the company. Senior management, including our President and Chief Executive Officer, Chief Financial Officer and Chief Operating Officer, are responsible for our day-to-day operations. *The board evaluates our corporate performance and approves, among other things, corporate strategies, objectives, operating plans, significant policies and major commitments of corporate*

*resources*. The board also evaluates and elects our executive officers, and determines their compensation.[14]

94.     However, the 2014 Proxy was false and misleading at the time it was issued as the Individual Defendants utterly failed to disclose that they caused the Company to enter into a secret, paid stock promotion scheme with Emerging Growth/TDM, whereby these paid promoters would disseminate positive but misleading reports about the Company and its prospects in order to pump up the price of the Company's stock, in turn allowing the Company to raise tens of millions of dollars, secure the Individual Defendants' positions as directors and officers within the Company, and allow certain of the Individual Defendants (each of whom was a director) to cash in on their investment in the Company to the tune of millions of dollars.

95.     On March 25, 2014, the Individual Defendants caused Galectin to issue a press release entitled "Galectin Therapeutics to Announce Results From First Cohort of Phase 1 Clinical Trial in Fatty Liver Disease," announcing that the Company "will report results from the first cohort of its Phase 1 clinical trial examining GR-MD-02 in fatty liver disease (NASH) with advanced fibrosis" on March 31, 2014.  Specifically, the press release stated, in pertinent part:

> Galectin Therapeutics (Nasdaq:GALT), the leading developer of therapeutics that target galectin proteins to treat fibrosis and cancer, announced that on Monday, March 31, 2014, the Company will report results from the first cohort of its Phase 1 clinical trial examining GR-MD-02 in fatty liver disease (NASH) with advanced fibrosis. The first-in-man study, which enrolled eight patients in the first cohort, is evaluating the safety, tolerability, and exploratory biomarkers for efficacy for single and multiple doses of galectin inhibiting drug GR-MD-02 when administered to patients with fatty liver disease with advanced fibrosis.
>
> Peter G. Traber, M.D., Chief Executive Officer, President and Chief Medical Officer of Galectin Therapeutics, will lead a webcast and conference call on April 1, 2014 at 8:30 a.m. Eastern Daylight Time to review the findings. As time

---

[14]  The 2014 Proxy also notes that the "Board currently consists of ten directors, *eight of whom will stand for election at our 2014 annual meeting of stockholders and two of whom are nominated and elected by the holder of our Series B preferred stock voting as a separate class.*"  This representation conflicts with other parts of the 2014 Proxy, which calls for nine (9) directors to stand for election (defendants Traber, Martin, Amelio, Freeman, Greenberg, Mauldin, Prelack, Pressler and Rubin) with only defendant Czirr serving as the Series B director. *Compare* 2014 Proxy p. 1, 9 *with* p. 14.

permits, a question and answer session will immediately follow Dr. Traber's presentation.

*       *       *

The Phase 1 multi-center, partially-blinded clinical trial is being conducted in a total of 24 patients who receive four weekly doses of GR-MD-02. Each of the three cohorts consists of eight patients, six randomized to receive active drug and two randomized to receive placebo. Eight U.S. clinical sites with extensive experience in clinical trials in liver disease are now active to ensure rapid enrollment of the second cohort. Trial design details can be found at http://clinicaltrials.gov/ct2/show/NCT01899859?term=gt-020&rank=1.

GR-MD-02 is a complex carbohydrate drug that targets galectin-3, a critical protein in the pathogenesis of fatty liver disease and fibrosis. Galectin proteins play a major role in diseases that involve scaring of organs such as cancer, and inflammatory and fibrotic disorders. The drug binds to galectin proteins and disrupts their function. Preclinical data has shown that GR-MD-02 has robust treatment effects in reversing fibrosis and cirrhosis.

96.     On March 27, 2014, Emerging Growth/TDM published an "article" written by Zucker entitled "Leading Companies Being Defined in the Hunt for a NASH Treatment,"[15] which was disseminated via a press release through *Accesswire* in which Emerging Growth/TDM once again touted Galectin and its prospects.  The "article" stated, in pertinent part:

The race to develop a treatment for Non-Alcoholic Steatohepatitis (NASH) is getting a lot of airtime lately, pointing to the severity of the disease, poor prognosis and desperate need for a treatment.  The space has only a handful of competitors, with most seeing rising valuations due to the tremendous peak sales that analysts are projecting for products that make it to market.  What is particularly unique to this disease is not only the lack of any approved treatments, but also the influx of attention and growing broad body of research by *companies like Intercept Pharmaceuticals (ICPT), Galmed Pharmaceuticals (GLMD) and Galectin Therapeutics (GALT) that shows treatments are on the horizon, which gives these equities considerable upside*.

*       *       *

NASH is a severe form of Non-Alcoholic Fatty Liver Disease (NAFLD), a condition that has become increasingly common in the United States.  NAFLD in its simplest state is essentially benign, but as the condition worsens, NASH

---

[15]     Available at http://finance.yahoo.com/news/leading-companies-being-defined-hunt-143000796.html.

arises.  The cause of NASH may still remain a mystery, but NAFLD commonly presents in patients with diabetes and obesity. With the skyrocketing diagnosis rate of those diseases, subsequently so goes the incidence rate of NAFLD and NASH.  Further, NASH is also linked to increased risk of cardiovascular complications, a leading killer in North America.  Sadly, liver fibrosis and NASH are not reversible and often lead to the necessity for a liver transplant, of which only about 6,000 actually happen each year.

*These facts make Galectin Therapeutics particularly attractive as early research shows its lead drug candidate GR-MD-02 to actually reverse fibrotic damage*. Although the company may trail Intercept and Galmed in stage of human trials at this point, *Galectin is only a clinical data set away from a potential leap forward with GR-MD-02.  The drug is being developed under a "Fast Track" designation from the FDA, which provides an expedited developmental pathway as well as other benefit*s.

Galectin is in a Phase 1 trial of GR-MD-02, a complex carbohydrate drug that targets and inhibits galectin-3, a key protein in the pathogenesis of fatty liver disease.  *A critical difference in the trial protocol is that Galectin is treating patients with NASH and advanced fibrosis, rather than earlier stages of the disease as other biotechs are.  Moreover, in animal models, GR-MD-02 was shown to not only stop liver scarring from worsening; it showed the damage to start to be repaired*.

Shares of GALT got a brief bump on Tuesday when the company announced that it will be reporting results from the eight patients in the first cohort in the Phase 1 trial on Monday, March 31.

Estimates show that up to 37 million adults in the U.S. have NASH, but this number could be conservatively low because the relatively asymptomatic disease often goes undetected until advanced stages.  As estimates stand currently, nearly 10 million NASH patients will progress to develop liver cirrhosis.  *Halting the progression of fatty liver disease as Intercept has done is certainly a keystone moment in the overall genesis of new therapies, but tackling the disease as it reaches the often-terminal latter stages, as Galectin is aiming to do, will likely capture a far greater market share should regulatory approval be attained by both companies*.

97.    On March 31, 2014, the Individual Defendants caused Galectin to issue a press release entitled "First Cohort Results in Galectin Therapeutics' Phase 1 Trial Reveal Biomarker Evidence of Therapeutic Effect on Fibrosis and Inflammation in NASH With Advanced Fibrosis," which stated in part:

Galectin Therapeutics (Nasdaq:GALT), the leading developer of therapeutics that target galectin proteins to treat fibrosis and cancer, today announced that results from the first cohort of its Phase 1 trial show that GR-MD-02 had an effect on

biomarkers that suggest a therapeutic effect on fibrosis, inflammation, and cellular injury. The first-in-man study, which enrolled eight patients in the first cohort, is evaluating the safety, tolerability, and exploratory biomarkers for efficacy for single and multiple doses of its galectin-inhibiting drug GR-MD-02 when administered to patients with fatty liver disease (NASH) with advanced fibrosis.

First cohort results indicate that GR-MD-02 was safe and well tolerated following four doses of 2 mg/kg (80 mg/m$^2$) and there were no serious adverse events. The pharmacokinetics were consistent between individuals and after single and multiple doses with no drug accumulation after multiple doses. In assessing secondary endpoints, it was found that multiple biomarkers of fibrosis and inflammation showed improvement after four doses of GR-MD-02. Additionally, patients with greater evidence of liver cell injury, as indicated by elevated transaminase enzyme levels, had a marked decrease in CK-18, a clinically validated biomarker of cell death. Galectin-3 blood levels, which do not correlate with tissue levels in NASH, were not changed with treatment.

*       *       *

"We are extremely pleased with the positive results of the first cohort of our Phase 1 trial, which suggest a role for GR-MD-02 in the treatment of patients with fatty liver disease with advanced fibrosis," said Peter G. Traber, M.D., Chief Executive Officer, President and Chief Medical Officer of Galectin Therapeutics. "Fatty liver disease, characterized by the presence of fat in the liver along with inflammation, over time can develop into fibrosis, or scarring of the liver, which is estimated to affect millions of Americans. Intervention with the intent of reversing the fibrosis is a potentially important therapeutic approach in fatty liver disease, a condition with significant unmet medical need."

98.     Emerging Growth/TDM disseminated another press release through *Accesswire* on April 8, 2014, again written by Zucker, entitled "Treatments for Non-Alcoholic Steatohepatitis Making Clinical Strides."[16]  While the "article" mentioned several companies with drugs in development for the treatment of NASH, the main focus of the "article" concerned Galectin's purported "unique approach" in dealing with NASH and highlighted the "results" announced the previous week, on March 31, 2014, by the Company.  Specifically, the "article" stated, in pertinent part:

*       *       *

---

[16]    Available at http://finance.yahoo.com/news/treatments-non-alcoholic-steatohepatitis-making-150000187.html.

*Galectin Therapeutics is developing GR-MD-02 for NASH and taking a unique approach compared to competitors by targeting NASH patients with biopsy-proven advanced fibrosis.  Pre-clinical research suggested that the drug has the potential to not only stop the progression of NASH, but to actually reverse some of the fibrotic damage*.  Additionally, Galectin is initially not using the invasive biopsy process as a biomarker.  It is using serum biomarkers, which is supportive of the industry as a whole in defining more accurate diagnostics with less invasive technologies to diagnosis disease progression.  *Last Monday, Galectin released information from the first cohort in a phase 1 clinical trial, presenting a substantial compilation of clinical data that deserves a closer look*.

## The Key Takeaways of the Data

*First and foremost, GR-MD-02 was shown to be safe and well tolerated with no drug-related serious adverse events reported, the primary endpoint of any phase 1 trial*.  The initial dose for the first cohort was 2 mg/kg (80 mg/m2), which will be doubled in the second cohort.  8 patients (6 in the treatment arm, 2 in placebo arm) were enrolled in the first cohort, seven of which had stage 3 fibrosis and one with stage 4 fibrosis, and all the patients completed the full protocol.

The trial looked at certain hallmarks of any clinical trial, such as safety and pharmacokinetics, as well as dialing-in the effect of GR-MD-02 by examining a broad spectrum of serum biomarkers of NASH, including composite biomarkers of fibrosis, inflammatory cytokines and ALT levels as a proxy of apoptosis. Galectin's approach covered the gamut of pathological processes of NAFLD by studying biomarkers pertaining specifically to NASH as well as biomarkers specific to fibrosis and cirrhosis. This analysis provides a wider breadth of knowledge about GR-MD-02, as these stages of liver disease don't always have congruous details.  This is an important aspect of the trial, providing wide-ranging data on the effects in the current study and helping to delineate future research.

*Results from the FibroTest, an indirect biomarker of fibrosis, showed a significant reduction in scores, which suggests fibrosis regression in patients treated with GR-MD-02*.  The ELF (Enhanced Liver Fibrosis) test, considered a direct biomarker of fibrosis that has been shown to be predictive of mortality, showed that scores tended to decrease in patients in the treatment arm, but did not produce a "statistically significant" change because of the small sample size of the study.  To that point, the researchers will be looking for additional validation of the trend as enrollment grows throughout the trial.

*The study also looked at Hyaluronic Acid (HA) levels, which are known to be elevated in liver fibrosis.  In 3 of the 6 patients treated with GR-MD-02, HA levels decreased, essentially consistent with pre-clinical data*.

Regarding inflammation, levels of key cytokines associated with the advancement of NASH were evaluated.  Elevated levels of these cytokines in NAFLD patients are indicative of lipid accumulation and inflammation of the liver.  Patients treated with GR-MD-02 showed about a 25% reduction in levels of interleukin-8 from day 1 to day 56.  Levels of interleukin-6 and TNF-alpha levels were also

42

significantly reduced in patients treated with Galectin's drug, as compared to the placebo group.

A measure of cellular injury looked at ALT and AST, two common enzymes released by the liver cells, as part of the safety profile. It is notable that these serum transaminases are relatively poor as a NASH diagnostic because patients with normal levels of ALT and AST can still have NASH. What is interesting in the data, though, is that two of the treated patients with ALT levels above 100 units/liter showed reductions in ALT levels of 39 U/L and 67 U/L, respectively. Data from these patients were looked at more closely in combination with the impact of GR-MD-02 on cell death biomarker cytokeratin 18, a protein that is known to be predictive of NASH severity.

The two patients that demonstrated a sharp drop in ALT levels also showed a marked decrease in CK-18 levels by the end of the treatment period. Taking things a step further, those two patients also showed significant reduction in FibroTest scores and in levels of the protein lumican, a matrix protein in the liver involved with fibrogenesis. By comparison, treated patients with low ALT levels showed improvement in fibrosis biomarkers, but not in CK-18 levels.

### So What Does This All Mean?

*The data suggests that Galectin was pretty much right on target with the assessment of GR-MD-02 before the clinical trial began*. There appears to be data supporting the drug candidate to slow and potentially reverse tissue damage in patients with NASH with advanced fibrosis, but the trials are still very early and with a limited number of patients. *In short, efficacy is never a spoken primary goal of early clinical trials, but the data lends additional confidence of a biological effect of GR-MD-02 even at low doses, while holding a strong safety profile*. *As Dr. Peter Traber, CEO and President of Galectin, said in a* conference call discussing the clinical data*, the company is pleased to see "consistent changes in fibrosis markers and inflammatory markers after four infusions of [GR-MD-02].*" Secondly, by looking at a wide swath of data, Galectin seems to have gleaned some key information that may better delineate future patient populations with high ALT levels with respect to cellular injury.

Eight clinical sites are now active to begin enrollment of eight more patients for the second cohort, to be treated with a substantially higher dose of GR-MD-02 (4 mg/kg). Galectin said it believes the optimal dose equivalency from mouse studies would be approximately 8 mg/kg in humans, so the increased dose in cohort two should deliver valuable info on that matter. Further, FibroScan™, an ultrasonic medical device that measures liver tissue elasticity, has been added to the protocol to assess the effect of the drug. The results from this cohort are expected in July or August.

99.     On the heels of this news, on April 11, 2014, while in possession of material, adverse, non-public information, defendant Prelack sold 6,000 shares of his personally held Galectin stock at the artificially inflated price of $11.84 per share, reaping proceeds of $71,010.

100.    On April 23, 2014, the Individual Defendants caused Galectin to issue a press release entitled "Galectin Therapeutics Completes Enrollment of Second Cohort of Phase 1 Trial of GR-MD-02 for NASH (Fatty Liver Disease) With Advanced Fibrosis," which stated in part:

> "We are pleased that enrollment of the second cohort was completed very rapidly, which speaks to the urgent need to identify an effective treatment for fatty liver disease with advanced fibrosis," said Dr. Peter G. Traber, President, Chief Executive Officer, and Chief Medical Officer of Galectin Therapeutics Inc. "The goal of therapy with GR-MD-02 in NASH patients with advanced fibrosis is the reversal of fibrosis and prevention of complications of cirrhosis and liver transplantation."

101.    On May 13, 2014, the Individual Defendants caused Galectin to issue a press release announcing the Company's first quarter 2014 financial results.  Although the Company reported a net loss of $5.4 million, or ($0.27) diluted earnings per share ("EPS") for the first quarter of 2014, the tone of the press release was positive, stating in pertinent part:

> "We continued to make significant progress in our liver fibrosis development program through the first quarter of 2014. We announced the successful results of the first cohort of patients in our Phase 1 clinical trial for patients with NASH with advanced fibrosis, which demonstrated that GR-MD-02 was safe and well tolerated. Additionally, the results demonstrated positive changes in biomarkers, suggesting a therapeutic effect on fibrosis. More recently, we announced on April 23, 2014, that we have completed the enrollment of all of the required patients in cohort 2 of this Phase 1 clinical trial, and we expect to announce the results around the end of July 2014," said Peter G. Traber, M.D., Chief Executive Officer, President and Chief Medical Officer, Galectin Therapeutics. "This Phase 1 first-in-man study is evaluating the safety, tolerability, pharmacokinetics and exploratory biomarkers for efficacy for single and multiple doses of GR-MD-02 when administered to patients with fatty liver disease with advanced fibrosis."

102.    That same day, on May 13, 2014, the Company filed its quarterly report for the period ended March 31, 2014.  The Form 10-Q - signed by defendants Traber and Callicutt - again failed to disclose the existence of the relationship, agreement, and scheme that the

Individual Defendants entered into with Emerging Growth/TDM.  And, like the previous SEC filings during the Relevant Period, the Form 10-Q again misstated GR-MD-02's purported effectiveness with respect to nonalcoholic steatohepatitis (NASH).  On that subject, the Form 10-Q represented, in relevant part:

> *Fibrosis.* GR-MD-02 is our lead product candidate for treatment of fibrotic disease. Our preclinical data show that GR-MD-02 has a powerful therapeutic effect on liver fibrosis as shown in several relevant animal models. Therefore, we chose GR-MD-02 as the lead candidate in a development program targeted initially at fibrotic liver disease associated with non-alcoholic steatohepatitis (NASH, or fatty liver disease). In January 2013, an Investigational New Drug ("IND") was submitted to the FDA with the goal of initiating a Phase 1 study in patients with NASH and advanced liver fibrosis to evaluate the human safety of GR-MD-02 and pharmacodynamics biomarkers of disease. On March 1, 2013, the FDA indicated we could proceed with a US Phase 1 clinical trial for GR-MD-02 with a development program aimed at obtaining support for a proposed indication of GR-MD-02 for treatment of NASH with advanced fibrosis.

> Our drug candidate provides a promising new approach for the therapy of fibrotic diseases, and liver fibrosis in particular. Fibrosis is the formation of excess connective tissue (collagen and other proteins plus cellular elements such as myofibroblasts) in response to damage, inflammation or repair. When the fibrotic tissue becomes confluent, it obliterates the cellular architecture, leading to scarring and dysfunction of the underlying organ.

103.   Also on May 13, 2014, Emerging Growth/TDM disseminated an article through *Accesswire* and written by Zucker entitled "Wall Street In and Out of Love with NASH Drug Developers"[17] which favorably compared Galectin to its peers, noting that Galectin treats patients with NASH with advanced fibrosis, a harder segment of patients to treat than those focused on by competitors, and highlighting the Company's data collecting from the first cohort study.  The May 13, 2014 article stated that the results of Galectin's second cohort study, which were due near the end of July 2014, "could serve as a springboard for share price movement."

104.   On May 16, 2014, the Individual Defendants caused the Company to announce, among other things, that all nine then-current directors on the Board up for re-election –

---

[17]   Available at http://finance.yahoo.com/news/wall-street-love-nash-drug-142000330.html.

defendants Amelio, Freeman, Greenberg, Martin, Mauldin, Prelack, Pressler, Rubin, and Traber - - had in fact been re-elected by shareholders pursuant to the 2014 Proxy to serve on the Board.

105.    On June 26, 2014, with updated results from Galectin's Phase 1 NASH study just weeks away, Emerging Growth/TDM disseminated another "article" through *Accesswire*, this time entitled "Catalysts on the Horizon for Companies Developing NAFLD and NASH Drugs."[18]  The article stated, in pertinent part:

*       *       *

Galectin Therapeutics is the other major player in the NAFLD/NASH space, developing carbohydrate-based drug candidates for fibrotic liver (and cancer) conditions.  Galectin has chosen to go after a difficult population of NAFLD patients, those with NASH with advanced fibrosis.  This is an important distinction from Intercept and Galmed, as Galectin is hoping to show not only a reduction in fat accumulation as its peers are aiming to demonstrate, but also a reversal to fibrotic damage in the liver in more advanced patients.  There is a further distinction in tackling the more advanced class of patients in that there is no clear set of standards in the pathogenesis of NAFLD to determine which patients will advance to NASH, cirrhosis or related conditions, so while halting the accumulation of fat is certainly paramount, reversing the damage is unprecedented.

In 2013, Galectin received a Fast Track designation from the FDA to expedite development of its drug GR-MD-02 for NASH patients with advanced hepatic fibrosis.

Galectin disclosed in April that it has completed enrollment in the second cohort of the trial, good news following a prior announcement that data from the first cohort showed the therapy to be safe and well tolerated.  The data further showed positive changes in pre-defined biomarkers for the trial, suggesting efficacy, although that is never a primary endpoint of early-stage clinical trials.  Dosing of GR-MD-02 for the second cohort was doubled from the first cohort, putting investors on close watch for results, which are slated for the latter part of next month.

With more than $36 million in cash on hand at the end of the first quarter, Galectin is plenty well financed to complete the Phase 1 trial of its drug, as well as other research throughout 2015.  To that point, Galectin has conducted some compelling lab studies to further support the potential of GR-MD-02, including **data from a pre-clinical trial** in a diabetic mouse model with NASH released on Monday.

---

[18]    Available at http://finance.yahoo.com/news/catalysts-horizon-companies-developing-nafld-134000256.html.

46

In the study, treatment with GR-MD-02 for four weeks significantly reduced liver weight, liver-to-body weight ratio and plasma triglyceride levels in mice with induced NASH. Blood biomarkers that are indicative of liver damage, such as aspartate aminotransferase, plasma alanine aminotransferase and plasma total bilirubin, also showed reductions back near normal levels in the treated mice. Further, the backbone of Galectin research was supported by the study, showing a significant reduction in fibrosis of the liver. Perhaps the most important aspect of this trial is that the mice were given oral treatments, as opposed to the intravenous administration in the Phase 1 human trials. The potential market for oral delivery is distinct and additive to the potential market for IV treatments. Every disease has a target product profile and while IV administration will provide the best results in some indications, oral delivery can be more appropriate for others, such as chronic diseases and conditions. This development bears watching over the long term as Galectin advances their clinical programs.

Adding to the interest in Galectin on Monday, analysts Aegis Capital **reiterated their "buy" rating** on the stock. In April, analysts at MLV & Co. put out a "buy" rating on GALT and boosted their price target from $20 to $27.

\*       \*       \*

106.    Then, on July 24, 2014, on the precipice of the release of updated results from Galectin's Phase 1 NASH study by the Company, Emerging Growth/TDM disseminated an article through *Accesswire* entitled "Galectin, Intercept, Others Vying for Lead Drugs in NASH Epidemic,"[19] which stated, in pertinent part:

Fat is driving the bus these days in one narrow, but widening, biotech sector as companies strive for dominance. Among these are Galectin Therapeutics Inc. (GALT), Intercept Pharmaceuticals (ICPT), Raptor Pharmaceuticals (RPTP) and Gilead Sciences (GILD), all of which are in search of a cure for one stage or another of "fatty liver disease."

Fatty liver disease, at its extreme, means certain death. The prize these companies are seeking is not only to cheat death but also to claw back some of the astronomical healthcare costs related to the condition. Taking into account the varying stages of fatty liver disease, the U.S. market is projected to be valued at up to $40 billion by 2025. There's always the liver transplant option, right? Wrong. One estimate, from TransplantLiving.org, places the cost of a liver transplant at nearly $600,000 and that estimate does not even cover all the other healthcare costs on the long road to referral for a transplant. For the half a million people in the U.S. that have liver cirrhosis or the up to 15 million people suffering from fatty liver disease, the hope for a transplant is not good either, considering only about 6,300 liver transplants are conducted annually.

---

[19]        Available    at    http://finance.yahoo.com/news/galectin-intercept-others-vying-lead-140000916.html.

Worse yet, diagnostics outside of a biopsy are lacking and there are no FDA approved therapies for the treatment of liver fibrosis, which explains the value Wall Street is placing on this relatively unattended segment of biotech.

Medical terms for these related diseases and their stages vary. NAFLD is a catch-all term meaning nonalcoholic fatty liver disease (estimated to affect about 30% of the North American population); NASH refers to nonalcoholic steatohepatitis, a condition which, according to a statement at Science.gov, "can progress to cirrhosis in 15-20%" of patients. The statement goes on to show that NAFLD "may predispose patients to hepatocellular carcinoma," i.e., liver cancer. The U.S. National Institutes of Health notes that "NASH occurs in people who drink little or no alcohol and affects 2 to 5 percent of Americans, especially people who are middle-aged and overweight or obese," and that the condition also occurs in children.

From a clinical stage perspective, Intercept is leading the race, having delivered positive data from a Phase 2 trial of obeticholic acid (OCA) earlier this year. Shares tripled on the news.  Galectin, a newly-coined member of the Russell 2000, *is nipping at Intercept's heels* and actually may be closer than what first appears with a Phase 1 trial because of the potential to treat fatty liver disease even once it has progressed.  What distinguishes their approach from others that the timing of intervention with their proprietary carbohydrate polymer drug GR-MD-02 may be largely irrelevant to outcomes, with GR-MD-02 seeming to work well even in advanced stages of liver fibrosis.  This is especially important in fatty liver diseases because they are silent killers, often going undiagnosed for many years.  The Galectin drug was granted FDA fast-track approval nearly a year ago.

Galectin has announced GR-MD-02 to be safe and well tolerated in the first cohort of patients in its clinical trial, *as well as showing changes in key biomarkers, which suggests a therapeutic effect on fibrosis, or scarring of the liver that leads to loss of liver function. Enrollment has been completed in the second cohort, with results expected in the next few weeks, potentially a catalytic moment for the company's value.*

Further, late in June Galectin disclosed that research in an animal model of NASH showed an oral version of GR-MD-02 to demonstrate a significant improvement in disease. Coming at NASH with both infused and oral formulations could give Galectin a competitive edge going forward.

Raptor has been narrowly focused on NASH treatment of adolescents with a slow-release form of cysteamine bitartrate, which it developed after obtaining rights to the core drug from University of California at San Diego. Raptor is conducting a Phase 2b trial under a Cooperative Research and Development Agreement with the National Institute of Diabetes and Digestive and Kidney Diseases, part of the National Institutes of Health.

48

Gilead is acting across a broader age spectrum in NASH treatment and should be completing enrollment soon for a Phase 2b testing of its drug simtuzumab (GS-6624). Results might be announced late 2016 or so. Gilead is looking to grow its footprint in the liver disease space that is being overrun by NASH diagnoses. The growing number of effective treatments for hepatitis C, including Gilead's Sovaldi, are lending to a stabilized number in liver transplants related to hep C, with predictions that NASH will surpass hep C as the leading cause of liver transplants by 2020.

The apparently sudden prevalence of fatty liver disease and NASH on the biotech horizon is due to the increasing incidence of obesity worldwide and greater awareness of the conditions. After all, NASH didn't even have a medical name three decades ago. A U.S. Centers for Disease Control report says that 34.9% of American adults are obese. That's a 50% increase in obesity in less than 40 years and has lent impetus to the rise in NASH, a disease dubbed "the next big global epidemic" on CNBC's NBR.

Those are big numbers and potentially big profits. So it is clear that fat is indeed driving the biotech bus, with Galectin, Intercept, Gilead and Raptor in the front seats and vying to take control of the wheel.

107.     On the heels of the glowing July 24, 2014 Emerging Growth "article," the Individual Defendants caused Galectin to issue a press release announcing a conference call on July 25, 2014 to provide updated results from the Company's Phase 1 NASH study.

108.     Following these releases, Galectin's stock price shot upwards from $13.72 per share on July 24, 2014 to close at $15.32 per share on July 25, 2014, reaching as high as $16.55 per share on July 25, 2014.

109.     Indeed, the Individual Defendants' and Emerging Growth/TDM's stock promotion scheme was working incredibly well. Specifically, from July 2013 – when Emerging Growth/TDM began getting paid to pump-up Galectin's stock price, until late July 2014 when the Individual Defendants' scheme unraveled, Galectin went from a sub-$5 stock to *tripling* in price, and was able to raise tens of millions of dollars in the process.

**REASONS THE INDIVIDUAL DEFENDANTS' STATEMENTS WERE IMPROPER**

110.    The true facts, which were known or were recklessly disregarded by the Individual Defendants during the Relevant Period but concealed from the investing public, were as follows:

(a)    the Company was secretly utilizing the services of paid stock promoters to disseminate positive, but misleading reports about Galectin's prospects;

(b)    GR-MD-02 did not provide the benefits suggested by the Individual Defendants when discussing the patent the Company was awarded or the Phase 1 clinical trial it was conducting; and

(c)    as a result of the foregoing, the Company's touted financial and business prospects were materially false and misleading at all relevant times.

111.    As a result of the Individual Defendants' false and misleading statements and omissions, Galectin shares traded at artificially inflated prices during the Relevant Period.  Once the true facts regarding the Company's stock promotion scheme, financial prospects, and future business prospects emerged, Galectin stock crumbled from its Relevant Period high of $18.30, sinking to a low of $5.15 per share on July 29, 2014, erasing ***more than $190 million*** in market capitalization, and returning the Company's value to essentially the same level it was before the Individual Defendants caused Galectin to hatch its secret promotion scheme with Emerging Growth/TDM.

**THE TRUTH EMERGES**

112.    On July 25, 2014, Feuerstein tweeted: "$GALT paying penny stock promoters to issue misleading PRs posted to Y!"

113.    Then, on July 28, 2014, Bleecker Street Research published an article on *SeekingAlpha.com*[20] reporting that Galectin "has strong ties to stock promoters" and was engaged in a misleading brand awareness campaign aimed at boosting its stock price.

114.    Also on July 28, 2014, Feuerstein published an article on *TheStreet.com* entitled "Galectin Pays Stock Promoters to Entice Retail Investors,"[21] in which Feuerstein built off the Bleecker Street Research report and revealed that Emerging Growth/TDM was the investor relations and marketing company Galectin was paying for misleading promotional campaigns to entice investors to buy its stock.  Feuerstein's article stated, in pertinent part:

> Last Thursday, Emerging Growth issued a press release, picked up by the Yahoo! Finance feed, which misleadingly compared Galectin to Intercept Pharmaceuticals(ICPT).
>
> From a clinical stage perspective, Intercept is leading the race, having delivered positive data from a Phase 2 trial of obeticholic acid (OCA) earlier this year. Shares tripled on the news. Galectin, a newly-coined member of the Russell 2000, is nipping at Intercept's heels and actually may be closer than what first appears with a Phase 1 trial because of the potential to treat fatty liver disease even once it has progressed. What distinguishes their approach from others that the timing of intervention with their proprietary carbohydrate polymer drug GR-MD-02 may be largely irrelevant to outcomes, with GRMD-02 seeming to work well even in advanced stages of liver fibrosis. This is especially important in fatty liver diseases because they are silent killers, often going undiagnosed for many years. The Galectin drug was granted FDA fast-track approval nearly a year ago.
>
> ***Only someone being paid to shill would claim Galectin is "nipping at Intercept's heels." Intercept is way ahead in developing a drug to treats non-alcoholic steatohepatitis (NASH), a severe form of fatty liver disease, and its clinical studies to date have been designed using appropriate endpoints.***
>
> ***Galectin, by comparison, is conducting a phase I "safety" study of its NASH candidate enrolling a tiny number of patients and using endpoints which collect useless biomarker data. It's as if Galectin doesn't really want to find out if their drug is effective against NASH.***

---

[20]    Available at http://seekingalpha.com/article/2347785-galectin-therapeutics-why-this-penny-stock-dressed-up-by-stock-promoters-is-a-short.

[21]    Available at http://www.thestreet.com/story/12823198/1/galectin-pays-stock-promoters-to-entice-retail-investors.html?puc=yahoo&cm_ven=YAHOO.

> After Emerging Growth's misleading press release was issued Thursday, Galectin followed up with a press release of its own on Friday to announce a conference call for Tuesday morning. The subject of the call: To discuss updated results from its phase I NASH study.  [Emphasis added.]

115.    On July 29, 2014, the Individual Defendants caused Galectin to announce that it had posted a new presentation on its website about the results of the second cohort of patients in its Phase 1 clinical trial.  The posted results were interpreted and characterized as "poor" by analysts.

116.    Then on July 29, 2014, Feuerstein published another article on *TheStreet.com* entitled "Galectin Drug is a Fatty Liver Flop,"[22] which stated in pertinent part:

> Fruit pectin is delicious spread on toast, but can an experimental drug derived from fruit pectin be effective as a treatment for fatty liver disease? Not so much, which explains the steep drop in Galectin Therapeutics (GALT) Tuesday.
>
> ***Galectin's experimental drug GR-MD-02 flopped in a phase I study of nonalcoholic steatohepatitis (NASH), a severe form of fatty liver disease. Across just about every biomarker for efficacy Galectin thought to measure, GR-MD-02 showed no difference from placebo.*** Galectin deemed the updated results from the phase I study to be a success because patients treated with GR-MD-02 reported no serious side effects, but of course, ineffective placebos rarely raise safety concerns.  [Emphasis added.]

117.    On this news, Galectin's stock plummeted $8.84 per share to close at $5.70 per share on July 29, 2014, a one-day decline of nearly 61% on extremely heavy trading volume – wiping out more than $190 million in market capitalization.

118.    On July 30, 2014, the Individual Defendants caused the Company to issue a press release entitled "Galectin Therapeutics Issues Statement on GR-MD-02 Development Program."[23]  Therein, the Individual Defendants for the first time ***admitted*** to hiring Emerging Growth in 2013, and further admitted that Emerging Growth had written ***no less than thirteen*** paid "articles" promoting Galectin stock.

---

[22]     Available at http://www.thestreet.com/story/12824525/1/galectin-drug-is-a-fatty-liver-flop.html.

[23]     *See* http://finance.yahoo.com/news/galectin-therapeutics-issues-statement-gr-130731968.html.

119.    Galectin shares have not recovered from these events.  In fact, as of February 27, 2015, Galectin common stock was trading at $3.40 per share, considerably below the price the Company's stock was trading at before the Individual Defendants hatched their secret stock promotion scheme to artificially inflate the price of the stock.

## INSIDER SELLING

120.    Not all shareholders were harmed by the Individual Defendants' actions.

121.    Indeed, during the Relevant Period, while in possession of material, adverse, non-public information, Director Defendants Czirr, Martin, and Prelack all took advantage of Galectin's artificially inflated stock price by collectively unloading (or in the case of defendants Czirr and Martin, causing an entity they control to unload) 235,772 shares of Galectin common stock valued at ***more than $3.125 million***.

122.    The Insider Selling Defendants sold Company stock at prices ranging between $11.79 per share to as high as $16 per share – far above the closing price of $5.70 per share Galectin common stock sank to on July 29, 2014 following the revelations of the Individual Defendants' illicit, secret scheme to artificially inflate Galectin's stock price and the disclosure of the "poor" Phase 1 clinical trial results, and well-above the trading price of the Company's stock as of the date of the filing of this Complaint. *See supra*, ¶119.

123.    Specifically, on October 7, 2013, with the price of Galectin stock more than double its pre-propaganda campaign value, and while in possession of material, adverse, non-public information, defendants Czirr and Martin caused the 10X Fund to sell 100,000 shares of its Galectin stock at artificially inflated prices of $11.79 per share, reaping proceeds of $1.179 million.

124.    Then, the following day, October 8, 2013, while in possession of material, adverse, non-public information, defendants Czirr and Martin caused the 10X Fund to sell an

additional 12,000 shares of its Galectin stock at artificially inflated prices of $12.36 per share, reaping proceeds of $148,320.

125.    On the heels of the news that Galectin received a U.S. patent for combination treatment for liver fibrosis, and with Galectin stock soaring, the Insider Selling Defendants unloaded more shares.  Specifically, on or about January 10, 2014, while in possession of material, adverse, non-public information, defendants Czirr and Martin caused the 10X Fund to sell 42,000 shares of its Galectin stock at artificially inflated prices of $16.00 per share, reaping proceeds of $672,000.  Then, on or about January 13, 2014, while in possession of material, adverse, non-public information, defendants Czirr and Martin caused the 10X Fund to sell an additional 58,000 shares of its Galectin stock at artificially inflated prices of $14.00 per share, reaping proceeds of $812,000.

126.    Defendant Prelack also sought to capitalize on Galectin's bloated stock price. Specifically, on January 31, 2014, while in possession of material, adverse, non-public information, defendant Prelack disposed of 17,772 shares of Galectin stock at artificially inflated prices of $13.71 per share for a benefit of $242,968.  Notably, according to the Form 4 filed with the SEC on February 4, 2014, this transaction represented shares forfeited in satisfaction of the exercise price of the vested options.  Had Galectin stock not been trading at artificially inflated prices (due to the Individual Defendants' scheme), Prelack would have been required to forfeit far more than 17,772 shares of Company stock.

127.    On April 11, 2014, while in possession of material, adverse, non-public information, defendant Prelack sold 6,000 shares of his personally held Galectin stock at artificially inflated prices of $11.84 per share, reaping proceeds of $71,010.  Prelack orchestrated this sale less than two weeks after the Individual Defendants boasted in a Company press release

that "First Cohort Results in Galectin Therapeutics' Phase 1 Trial Reveal Biomarker Evidence of Therapeutic Effect on Fibrosis and Inflammation in NASH With Advanced Fibrosis."

128.   These insider sales were executed under highly suspicious circumstances and while the Insider Selling Defendants possessed material, adverse, non-public Company information.   Notably, the insider sales referenced in ¶¶123-127 were *the first such sales of Company stock by any Galectin directors or officers since February 2009*, when the Company was known as Pro-Pharmaceuticals.

129.   Indeed, because of their roles as directors of Galectin during the Relevant Period, the Insider Selling Defendants either knew, consciously disregarded, were reckless and grossly negligent in not knowing, or should have known material, adverse, non-public information about the business of Galectin, including the fact that: (a) the Individual Defendants had hatched a scheme to cause the Company to utilize the services of paid stock promoters to disseminate positive, but misleading reports about Galectin's prospects, (b) GR-MD-02 did not provide the benefits suggested by the Individual Defendants when discussing the patent the Company was awarded or the Phase 1 clinical trial it was conducting, and (c) as a result of the foregoing, the Company's touted financial and business prospects were materially false and misleading throughout the Relevant Period.

130.   Thus, the Insider Selling Defendants had a duty not to sell shares while in possession of material, adverse non-public information concerning Galectin's financial and business prospects.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

131.   By reason of their positions as officers, directors, and/or fiduciaries of Galectin and because of their ability to control the business and corporate affairs of Galectin, the

Individual Defendants owed and owe the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Galectin in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Galectin and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

132.    Each director and officer of the Company owes to Galectin and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

133.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Galectin, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with Galectin, each of the Individual Defendants had knowledge of material non-public information regarding the Company. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

134.    To discharge their duties, the officers and directors of Galectin were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of Galectin were required to, among other things:

56

a.      Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b.      Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

c.      When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

**Audit Committee Duties**

135.    In addition to these duties, the members of the Audit Committee owed specific duties to Galectin under the Audit Committee's Charter to review and approve quarterly and annual financial statements and earnings press releases, and to ensure that the Company had appropriate and effective internal controls over financial reporting.

136.    Specifically, according to Galectin's Audit Committee Charter, the Audit Committee is responsible for, among other things:

- Providing oversight regarding significant financial matters, including such matters as borrowings, currency exposures, dividends, share issuance and repurchases.

- Providing any recommendations, certifications and reports that may be required by the SEC including the report of the Committee that must be included in the Company's annual proxy statement. As part of the CEO and CFO certification process for the Form 10-K and Form 10-Q, reviewing disclosures concerning any significant deficiencies in the design or operation of disclosure controls and procedures and any fraud involving management or other employees who have a significant role in the Company's internal controls.

- Reviewing and discussing the annual audited financial statements and quarterly financial statements with management and the independent auditor, including major issues regarding accounting, disclosure and auditing procedures and practices as well

as the adequacy of internal controls that could materially affect the Company's financial statements.

- Reviewing with management, the independent auditors, and the internal auditors, if any, the adequacy and effectiveness of the Company's internal controls, and the integrity of the Company's financial reporting process.

- Reviewing and approving any recommendations, certifications and reports that may be required by NASDAQ or the SEC, including the report of the Committee that must be included in the Company's annual proxy statement.

- Reviewing and discussing the annual audited financial statements and quarterly financial statements with management and the independent auditor, including the disclosures made in "Management's Discussion and Analysis of Financial Condition and Results of Operations," any major issues regarding accounting, disclosure and auditing procedures and practices, and the adequacy of internal controls that could materially affect the Company's financial statements. Based on such annual review, the Committee shall recommend to the Board the inclusion of the financial statements in the Company's annual report on Form 10-K.

- Discussing with management the type of presentation and type of information to be included in the Company's earnings press releases and the financial information and earnings guidance provided to, as applicable, analysts and rating agencies.

- Establishing and overseeing procedures for (a) the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters; and (b) the confidential anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

- Discussing with management and the independent auditor the Company's policies with respect to risk assessment and risk management.

- In consultation with, as applicable, the independent auditor, management and the internal auditors, reviewing the integrity of the Company's financial reporting process.

- Reviewing periodically issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements; and the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company.

- Reviewing, approving and overseeing any "related party transactions" on an ongoing basis, and establishing appropriate procedures to receive material information about and prior notice of such transactions.

- Reporting regularly to the Board of Directors.

137.   Upon information and belief, the Company maintained an Audit Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on the members of the Audit Committee as those set forth above.

**Duties Pursuant to the Company's Code of Conduct and Ethics**

138.   Additionally, the Individual Defendants, as officers and/or directors of Galectin, are bound by the Company's Code of Conduct and Ethics (the "Code") which, according to the Code, was adopted to deter wrongdoing and promote, among other things:

> Full, fair, accurate, timely and understandable disclosure in reports and documents filed with or submitted to the Securities and Exchange Commission and in other public communications made by the Company.

139.   With respect to public disclosures, the Code states, in pertinent part, that:

> The Company must also disclose to the SEC, our current stockholders and the investing public, information that is required to be disclosed under applicable laws, regulations or rules, and any additional information that may be necessary to ensure that the required disclosures are not misleading or inaccurate. The Company requires you to participate in the disclosure process, which is designed to record, process, summarize and report material information for disclosure, such that the information when disclosed is full, fair, accurate, timely and understandable.

140.   With respect to misrepresentations and false statements, the Code states, in pertinent part, that:

> Employees must never make a deliberate misrepresentation concerning the Company or its business operations. No employee shall create, or assist another in creating, a false or misleading entry on the Company's books.

141.   With respect to conflicts of interest, the Code states, in pertinent part, that:

> All employees are expected to make decisions in the best interest of the Company, and not for personal gain. Therefore, all employees are required to handle in an ethical manner any actual or apparent conflicts of interest between personal and professional relationships.

142.    With respect to insider trading, the Code states, in pertinent part, that:

Employees, officers and directors who have access to confidential information are not permitted to use or share that information for stock trading purposes or for any other purpose except the conduct of our business, whether or not such information is viewed as material. All non-public information about the Company should be considered confidential information. To use nonpublic information for personal financial benefit or to "tip" others who might make an investment decision on the basis of this information is not only unethical but also illegal.

143.    Upon information and belief, the Company maintained a version of the Code during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Individual Defendants, as those set forth above.

**Governance Committee Duties**

144.    In addition to their duties as directors of Galectin, the members of the Governance Committee owed specific duties to Galectin under the Governance Committee's Charter regarding the Code.

145.    Specifically, according to Galectin's Governance Committee Charter, the Governance Committee is responsible for, among other things:

- Periodically reviewing and recommending to the Board changes to the Code;

- Monitoring overall compliance with the Code;

- Reviewing all potential conflicts of interest under and violations of the Code; and

- Considering all waivers of compliance with the Code.

146.    Upon information and belief, the Company maintained a Governance Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on the members of the Governance Committee as those set forth above.

**Control, Access, and Authority**

147.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Galectin, were able to and did, directly and/or indirectly, exercise

control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Galectin.

148.    Because of their advisory, executive, managerial, and directorial positions with Galectin, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Galectin.

149.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Galectin, and was at all times acting within the course and scope of such agency.

**Reasonable And Prudent Supervision**

150.    To discharge their duties, the officers and directors of Galectin were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Galectin were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    properly and accurately guide investors and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

(d)    remain informed as to how Galectin conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws;

(e)     refrain from trading on material, adverse, non-public information; and

(f)     ensure that Galectin was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## BREACHES OF DUTIES

151.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to Galectin and its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of Galectin, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Galectin, the absence of good faith on their part, and a reckless disregard for their duties to Galectin and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to Galectin.

152.    The Individual Defendants each breached their duties of loyalty and good faith by issuing or by causing the Company to issue false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

153.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

154.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually

were.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

155.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties and unjust enrichment; and (b) disguise and misrepresent the Company's actual business and financial prospects.

156.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

157.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## DAMAGES TO GALECTIN

158.    As a result of the Individual Defendants' wrongful conduct, Galectin disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made.  The improper statements have devastated

Galectin's credibility.  Galectin has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

159.    As a direct and proximate result of the Individual Defendants' actions as alleged above, Galectin's market capitalization has been substantially damaged, losing tens of millions of dollars in value as a result of the conduct described herein.

160.    Further, as a direct and proximate result of the Individual Defendants' conduct, Galectin has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

a.    costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based at least in part on Galectin's artificially-inflated stock price; and

b.    costs incurred from the loss of the Company's customers' confidence in Galectin's products.

161.    Moreover, these actions have irreparably damaged Galectin's corporate image and goodwill.  For at least the foreseeable future, Galectin will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Galectin's ability to raise equity capital or debt on favorable terms in the future is now impaired.  The Company has also suffered a loss of almost $200 million in market capitalization as a direct result of the Individual Defendants' wrongdoing alleged herein.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

162.    Plaintiffs bring this action derivatively in the right and for the benefit of Galectin to redress injuries suffered, and to be suffered, by Galectin as a direct result of the Individual Defendants' breaches of fiduciary duties and other violations of law.  Galectin is named as a nominal defendant solely in a derivative capacity.

163.    Plaintiffs will adequately and fairly represent the interests of Galectin in enforcing and prosecuting its rights.

164.    Plaintiffs have continuously been Galectin shareholders at all relevant times, including at the time of the Individual Defendants' wrongdoing complained of herein. Specifically, Plaintiffs have continuously been shareholders of Galectin since 2003 and 2007, respectively.

165.    Plaintiffs did not make a pre-suit demand on the Board to pursue this action, because such a demand would have been a futile and wasteful act.

166.    Plaintiffs have not made any demand on shareholders of Galectin to institute this action since such demand would be a futile and useless act for the following reasons:

a.    Galectin is a publicly traded company with thousands of shareholders of record;

b.    Making demand on such a number of shareholders would be impossible for Plaintiffs, who haves no means of collecting the names, addresses, or phone numbers of Galectin shareholders; and

c.    Making demand on all shareholders would force Plaintiffs to incur excessive expense and obstacles, assuming all shareholders could even be individually identified with any degree of certainty.

167.    The Company has been directly and substantially injured by reason of the Individual Defendants' breaches of their fiduciary duties to Galectin.  Plaintiffs, as shareholders of Galectin, seek damages and other relief on behalf of the Company, in an amount to be proven at trial.

168.     At the time this action was commenced, the Board of Galectin consisted of the following ten (10) directors: Czirr, Martin, Amelio, Freeman, Greenberg, Mauldin, Prelack, Pressler, Rubin, and Traber.

**Direct Interestedness Based on Challenged Insider Sales**

169.     During the Relevant Period, defendants Czirr, Martin, and Prelack, either in their individual capacities or through entities they owned and/or controlled, illicitly sold shares of Galectin stock while they were in possession of material, adverse, non-public information, during a time in which Galectin stock was artificially inflated due to the Individual Defendants' misconduct.  Moreover, in making or causing these sales, Czirr, Martin, and Prelack violated the Company's insider trading policy, as set forth in the Code.

170.     As a result of these illicit insider sales, defendants Czirr, Martin, and Prelack each received direct financial benefits not shared with Galectin shareholders, and are, therefore, each directly interested in a demand.   Further, defendants Czirr, Martin, and Prelack each are interested in a demand because they face a substantial likelihood of liability for their breaches of fiduciary duties of loyalty and good faith based on their challenged insider sales.   Accordingly, demand upon Czirr, Martin, and Prelack is futile.

**Demand is Futile as to All Director Defendants Because the Director Defendants Face a Substantial Likelihood of Liability In Connection with the Secret Stock Promotion Scheme**

171.     The Director Defendants face a substantial likelihood of liability for their breaches of fiduciary duties of loyalty and good faith and other misconduct.  The Director Defendants were directors throughout the Relevant Period, and as such had fiduciary duties to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its financial and business prospects were accurate.

172.    The Director Defendants caused and/or allowed the Company to enter into the illicit, secret, and unethical stock promotion agreement with Emerging Growth/TDM, whereby the Company's stock price would be artificially inflated through a series of misleading "articles" published by Emerging Growth that appeared to be independent, but were in fact paid.  As set forth above, the Director Defendants admit to hiring Emerging Growth/TDM in June 2013, and admit that Emerging Growth published thirteen "articles" thereafter pursuant to that engagement. As a result of this illicit scheme, defendants Traber, Czirr, Martin, Amelio, Freeman, Greenberg, Mauldin, Prelack, Pressler, and Rubin (*i.e.* the entire Board) each face a substantial likelihood of liability for their breaches of fiduciary duties, rendering any demand upon them futile. Moreover, this conduct is not entitled to the protections of the business judgment rule, which also independently excuses demand.

173.    Further, Defendants Traber, Czirr, Martin, Amelio, Freeman, Greenberg, Mauldin, Prelack, Pressler, and Rubin (*i.e.* the entire Board) each signed the false and misleading 2013 10-K.  The 2013 10-K was false and misleading because (among other things) it utterly failed to disclose the scheme that Defendants had entered into with Emerging Growth/TDM, and misstated the benefits and effectiveness of GR-MD-02.  As a result, defendants Traber, Czirr, Martin, Amelio, Freeman, Greenberg, Mauldin, Prelack, Pressler, and Rubin (*i.e.* the entire Board) each face a substantial likelihood of liability for their breaches of fiduciary duties, rendering any demand upon them futile.

174.    Indeed, the Director Defendants, knowingly and/or with reckless disregard reviewed, authorized and/or caused the publication of materially false and misleading statements throughout the Relevant Period that caused the Company's stock to trade at artificially inflated prices.

175.    Moreover, the Director Defendants also wasted corporate assets by paying improper compensation, bonuses, and severance to certain of the Company's executive officers and directors.   The handsome remunerations paid to wayward fiduciaries who proceeded to breach their fiduciary duties to the Company was improper and unnecessary, and no person of ordinary, sound business judgment would view this exchange of consideration for services rendered as fair or reasonable.

176.    The Director Defendants' making or authorization of false and misleading statements throughout the Relevant Period, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls or internal auditing and accounting controls were sufficiently robust and effective (and/or were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence, and/or acts of corporate waste and abuse of control constitute breaches of fiduciary duties, for which the Director Defendants face a substantial likelihood of liability.   If the Director Defendants were to bring a suit on behalf of Galectin to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.   This is something they will not do.   For this reason demand is futile.

**Demand is Futile as to the Audit Committee Defendants**

177.    During the Relevant Period, Prelack (Chairperson), Freeman, and Greenberg served as members of the Audit Committee.   Pursuant the Company's Audit Committee Charter, the Audit Committee Defendants were specifically responsible for, among other things, reviewing and approving quarterly and annual financial statements and earnings press releases, overseeing Galectin's internal controls over financial reporting, and discharging their other duties described herein.   Despite these duties, the Audit Committee Defendants knowingly or

recklessly reviewed and approved, or failed to exercise due diligence and reasonable care in reviewing and preventing the dissemination of false and/or materially misleading earnings press releases and earnings guidance and failed in their specific duties to ensure that the Company's internal controls over financial reporting were sufficient and that statements made by the Company regarding its business and financial prospects were accurate.  Accordingly, the Audit Committee Defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith.  Any demand upon the Audit Committee Defendants therefore is futile.

**Demand Is Futile as to the Governance Committee Defendants**

178.    During the Relevant Period, Martin (Chairperson), Amelio, and Greenberg served as members of the Governance Committee.  Pursuant the Governance Committee Charter, the Governance Committee Defendants were specifically responsible for, among other things, monitoring compliance with the Code.  Despite these duties, the Governance Committee Defendants took no action in response to the repeated violations of the Code's provisions governing public disclosures, misrepresentations and false statements, conflicts of interest, and insider trading referenced herein.  Accordingly, the Governance Committee Defendants face a substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith. Any demand upon the Governance Committee Defendants therefore is futile.

**Demand is Futile as to Defendant Traber for Additional Reasons**

179.    In addition to the reasons discussed herein as to why demand is futile as to all Director Defendants, demand is futile as to Traber because there is reason to doubt that Traber is an independent director.

180.    Specifically, Traber's principal professional occupation is his employment with Galectin as its President, CEO, and CMO, pursuant to which he has received and continues to

receive substantial monetary compensation and other benefits.  In addition, according to the Company's most recent Proxy filed with the SEC and disseminated to shareholders on April 7, 2014, the Board admits that Traber is not an independent director.  Thus, Traber lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.

181.    Traber also cannot disinterestedly consider a demand to bring suit against himself because Traber is a named defendant in the Securities Class Action which alleges that he made many of the same misstatements described above in violation of the federal securities laws. Thus, if Traber were to initiate suit in this action he would compromise his ability to simultaneously defend himself in the Securities Class Action and would expose himself to liability in this action.  This he will not do.

182.    As such, Traber cannot independently consider any demand to sue himself for breaching his fiduciary duties to Galectin, because that would expose him to liability and threaten his livelihood.

**Demand is Futile as to Defendant Czirr for Additional Reasons**

183.    In addition to the reasons discussed herein as to why demand is futile as to all Director Defendants, demand is futile as to Czirr because there is reason to doubt that Czirr is an independent director.

184.    Specifically, demand is futile as to Czirr since he is an executive officer of the Company who derives substantial income from his employment with Galectin, making him, as acknowledged by the Board in Galectin's most recent Proxy filed with the SEC and disseminated to shareholders on April 7, 2014, not an independent director.

185.    Czirr also cannot disinterestedly consider a demand to bring suit against himself because Czirr is a named defendant in the Securities Class Action which alleges that he made

many of the same misstatements described above in violation of the federal securities laws. Thus, if Czirr were to initiate suit in this action he would compromise his ability to simultaneously defend himself in the Securities Class Action and would expose himself to liability in this action.  This he will not do.

186.    Czirr faces a substantial likelihood of liability for breach of fiduciary duties in connection with the sales of Galectin stock he caused the 10X Fund to execute, as set forth herein.

187.    As such, Czirr cannot independently consider any demand to sue himself for breaching his fiduciary duties to Galectin, because that would expose him to liability and threaten his livelihood.

**Demand is Futile Because Czirr and Martin Control the Board**

188.    Defendants Traber, Amelio, Freeman, Greenberg, Mauldin, Prelack, Pressler, and Rubin (a majority of the Board) are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action since, in addition to their participation or approval in the wrongs alleged herein, each of these defendants is controlled by defendants Czirr and Martin.

189.    In 2009, Czirr and Martin led a takeover of the Company.

190.    Czirr and Martin are also co-founders of the 10X Fund.

191.    As of March 19, 2014, 10X Fund – which is controlled by Martin and Czirr - is the owner of all of the issued and outstanding shares of Galectin Series B preferred stock.

192.    As holders of Galectin Series B preferred stock, 10X Fund has the right to, among other things, vote as a separate class to nominate and elect two directors, referred to as the Series B directors, and to nominate three directors, referred to as the Series B nominees, who must be

recommended for election by holders of all of Galectin's securities entitled to vote on election of directors. In fact, Czirr is the Series B director.

193. In addition to controlling all of the issued and outstanding shares of the Series B preferred stock, Czirr, Martin, and 10X Fund, collectively, own a significant amount of the Company's common stock.

194. Czirr and Martin serve as Executive Chairman and Vice Chairman of the Board, respectively, and Martin also serves as the Chairperson of the Governance Committee **and** Compensation Committee.

195. Due to their significant business ties with one another, Czirr and Martin are beholden to one another.

196. Further, because of the influence each has as a result of their positions on the Board and ownership of all of the Series B preferred stock and significant holdings of the Company's common stock, Defendants Traber, Amelio, Freeman, Greenberg, Mauldin, Prelack, Pressler, and Rubin (a majority of the Board) are beholden to defendants Czirr and Martin, and are therefore incapable of impartially considering a demand to commence and vigorously prosecute this action against defendants Czirr and Martin.

197. Thus, demand is futile as to defendants Traber, Amelio, Freeman, Greenberg, Mauldin, Prelack, Pressler, and Rubin.

## COUNT I

### Against The Individual Defendants For Violations Of Section 14(a)
### Of The Securities Exchange Act Of 1934

198. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein, except as to any allegations relating to recklessness and knowing conduct on the part of any Defendant.

72

199.    This claim for relief is not based on any allegations of knowing or reckless conduct by any Defendant.  This claim does not allege, and does not sound in fraud, and Plaintiffs disclaim any reliance upon or reference to allegations of fraud.

200.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), provides that "[i]t shall be unlawful for any person, by use of the mails or by means of instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, *in contravention of such rules and regulations as the [SEC] may prescribe* as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

201.    Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. §240.14a-9.

202.    Here, the 2014 Proxy violated §14(a) and Rule 14a-9 because it utterly failed to disclose that Defendants had caused the Company to enter into a secret stock promotion scheme with Emerging Growth/TDM, whereby these promoters would be paid to disseminate positive but misleading reports about the Company.

203.    In the exercise of reasonable care, the Individual Defendants should have known that by failing to disclose this material fact, the statements contained in the Proxy were materially false and misleading.

204.    The misrepresentations and omissions in the Proxy were material to Plaintiffs in voting on the Proxy.  The Proxy was an essential link in the accomplishment of the continuation

of the Individual Defendants' unlawful scheme with Emerging Growth/TDM, as revelations of the truth would have immediately thwarted a continuation of shareholders' endorsement of the directors' positions, the executive officers' compensation, and the Company's compensation policies.

205.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy.

## COUNT II

### Against The Individual Defendants For Breaches Of Fiduciary Duties

206.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

207.    The Individual Defendants owed and owe Galectin fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Galectin the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

208.    As alleged in detail herein, each of the Individual Defendants (and particularly the Audit Committee Defendants) had a duty to ensure that Galectin disseminated accurate, truthful and complete information to its shareholders.

209.    The Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

210.    The Individual Defendants each knowingly, recklessly or negligently approved the issuance of false statements that misrepresented and failed to disclose material information concerning the Company.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

211.   Additionally, as is also alleged herein, each of the Individual Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

212.   Yet, the Individual Defendants willfully ignored the obvious and pervasive problems with Galectin's internal controls practices and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

213.   As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Galectin has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

214.   Plaintiffs, on behalf of Galectin, have no adequate remedy at law.

## COUNT III

**Against The Insider Selling Defendants For Breaches Of Fiduciary Duties For Insider Selling And Misappropriation Of Information**

215.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

216.   At the time of the stock sales set forth herein, the Insider Selling Defendants were in possession of material, adverse, non-public information described above, and sold Galectin common stock on the basis of such information.

217.   The information described above was proprietary, non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company that the Insider Selling Defendants used for their own benefit or for the benefit of an entity they controlled when they sold Galectin common stock.

218.     At the time of their stock sales, the Insider Selling Defendants knew the Individual Defendants had secretly hired Emerging Growth/TDM to disseminate positive but misleading reports about the Company, and knew that GR-MD-02 did not provide the benefits suggested by the Individual Defendants when discussing the patent the Company was awarded or the Phase 1 clinical trial the Individual Defendants were causing the Company to conduct.  As such, the Insider Selling Defendants knew the Company's touted financial and business prospects were materially false and misleading at all relevant times during the Relevant Period.

219.     The Insider Selling Defendants' stock sales while in possession and control of this material adverse, non-public information constituted breaches of their fiduciary duties of loyalty and good faith and/or an unlawful misappropriation of Company information.

220.     Since the use of the Company's proprietary information for their own gain constitutes breaches of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

221.     Plaintiffs, on behalf of Galectin, have no adequate remedy at law.

### COUNT IV

### Against The Individual Defendants For Unjust Enrichment

222.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

223.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Galectin.

224.     The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Galectin.

76

225.    Further, the Insider Selling Defendants sold Galectin common stock (or caused it to be sold for their benefit) while in possession of material, adverse non-public information that artificially inflated the price of Galectin stock.   As a result, the Insider Selling Defendants profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

226.    Plaintiffs, as shareholders and representatives of Galectin, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct and fiduciary breaches.

227.    Plaintiffs, on behalf of Galectin, have no adequate remedy at law.

## COUNT V

### Against The Individual Defendants For Waste Of Corporate Assets

228.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

229.    The wrongful conduct alleged regarding the issuance of false and misleading statements, was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and on-going harm to the Company.

230.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (i) paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; (iii) paying Emerging Growth/TDM to improperly tout the Company; and (iv) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

231.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

232.    Plaintiffs, on behalf of Galectin, have no adequate remedy at law.

## COUNT VI

### Against The Individual Defendants For Aiding And Abetting Fiduciary Violations

233.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

234.    The wrongful conduct alleged herein was continuous, connected, and on-going since at least July 2013.  The Individual Defendants' misconduct resulted in continuous, connected, and on-going harm to the Company.

235.    The Individual Defendants had the power and/or ability to, and did, directly or indirectly control or influence the Company's general affairs, including the content of public statements disseminated by Galectin and had the power and/or ability directly or indirectly to control or influence one another.

236.    Each Individual Defendant is jointly and severally liable to the same extent as any other Defendant is liable for breaches of fiduciary duties as set forth herein or violations of any other laws.

237.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

238.    Plaintiffs, on behalf of Galectin, have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.    Against all Defendants for the amount of damages sustained by the Company as a result of Defendants' wrongdoing as alleged herein;

B.    Directing Galectin to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Galectin and its shareholders from a repeat of the damaging events described herein, including,

but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following corporate governance proposals or policies:

- a proposal to strengthen the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- a proposal to strengthen the Company's internal reporting and financial disclosure controls;

- a proposal to develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a proposal to ensure the accuracy of the qualifications of Galectin directors, executives and other employees;

- a provision to strengthen the Company's oversight and controls over insiders' purchase and sale of Company stock;

- a proposal to require an independent Chairman of the Board;

- a proposal to strengthen the Company's procedures for the receipt, retention and treatment of complaints received by the Company regarding internal controls; and

- a provision to appropriately test and then strengthen the Company's internal operational control functions.

C.      Awarding to Galectin restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

D.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: February 27, 2015

JOHNSON & WEAVER, LLP

*s/Michael I. Fistel, Jr.*
MICHAEL I. FISTEL, JR.
michaelf@johnsonandweaver.com
Georgia Bar No.: 262062
40 Powder Springs Street
Marietta, GA 30064
Telephone: (770) 200-3104
Facsimile: (770) 200-3101

JOHNSON & WEAVER, LLP
Frank J. Johnson  *(admitted pro hac vice)*
frankj@johnsonandweaver.com
600 West Broadway, Suite 1540
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856

THE WEISER LAW FIRM, P.C.
Robert B. Weiser
rw@weiserlawfirm.com
Brett D. Stecker
bds@weiserlawfirm.com
James A. Ficaro
jac@weiserlawfirm.com
22 Cassatt Avenue, First Floor
Berwyn, PA 19312
Telephone: (610) 225-2677
Facsimile:  (610) 408-8062

THE WEISER LAW FIRM, P.C.
Kathleen A. Herkenhoff
kah@weiserlawfirm.com
12707 High Bluff Drive, Suite 200
San Diego, CA 92130
Telephone: (858) 794-1441
Facsimile: (858) 794-1450

*Co-lead Counsel for Plaintiffs*

80

DocuSign Envelope ID: D6977E55-63C4-4C86-AD0C-FA836D2AAD3A

# <u>VERIFICATION</u>

I, David L. Hasbrouck, verify that I have reviewed the foregoing Verified Consolidated Shareholder Derivative Complaint, and that the allegations as to me are true and correct and that the other allegations upon information and belief are true and correct.

Dated:  February 20th, 2015

DocuSigned by:

428AE31440B2426...

(Signature of David L. Hasbrouck)

## **VERIFICATION**

I, Sui Yip, under penalty of perjury, state as follows:

I am the Plaintiff in the above-captioned action.  I have read the foregoing Complaint and authorized its filing.  Based upon the investigation of my counsel, the allegations in the Complaint are true to the best of my knowledge, information and belief.

DATED: ___2/24/2015_____    _____

                                                                   Sui Yip

## CERTIFICATE OF SERVICE

I hereby certify that on February 27, 2015, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on February 27, 2015.

*s/Michael I. Fistel, Jr.*
MICHAEL I. FISTEL, JR.

JOHNSON & WEAVER, LLP
Georgia Bar No.: 262062
40 Powder Springs Street
Marietta, GA 30064
Telephone: (770) 200-3104
Facsimile: (770) 200-3101
michaelf@johnsonandweaver.com

# Mailing Information for a Case 1:15-cv-00208-SCJ

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael Ira Fistel , Jr**
  michaelf@johnsonandweaver.com,paralegal@johnsonandweaver.com

- **Frank J. Johnson**
  frankj@johnsonandweaver.com

- **Benjamin Lee**
  blee@kslaw.com,danderson@kslaw.com

- **B. Warren Pope**
  wpope@kslaw.com

- **Michael R. Smith**
  mrsmith@kslaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Nathan            Hamler
Johnson & Weaver, LLP -CA
Suite 1540
600 West Broadway
San Diego, CA 92101
```